# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

JAMES KELLIHER,

        Plaintiff,

v.

NORTH CAROLINA DEPARTMENT OF
PUBLIC SAFETY *et al.*,

        Defendants.

Case No. 5:16-CT-03250-BO

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Chelsea Corey, NCSB No. 48838
KING & SPALDING LLP
100 North Tryon Street, Suite 3900
Charlotte, North Carolina 28202
E-mail: ccorey@kslaw.com
Telephone: (704) 503-2575
Telefax: (704) 503-2622

and

Kevin O'Brien
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
E-mail: kobrien@kslaw.com
Telephone: (404) 572-2442
Telefax: (404) 572-5100

*Attorneys for Plaintiff James Kelliher*

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...............................................................................................1

**STATEMENT OF FACTS** ....................................................................................................2

**ARGUMENT** ..........................................................................................................................10

   I.   PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE
      MERITS. ..........................................................................................................................10

       A.  Plaintiff Is Likely to Succeed on the Merits of His RLUIPA Claim. ..........................10

       B.  Plaintiff Is Likely to Succeed on the Merits of His Free Exercise Claim. ...................16

  II.  PLAINTIFF IS LIKELY TO SUFFER IRREPARABLE HARM
      OUTWEIGHING ANY HARM TO DEFENDANTS IN THE ABSENCE OF
      INJUNCTIVE RELIEF. ..................................................................................................18

  III. THE EQUITIES WEIGH IN FAVOR OF GRANTING PLAINTIFF
      INJUNCTIVE RELIEF. ..................................................................................................19

  IV. THE PROPOSED INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST. ...........19

**CONCLUSION** ........................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*A.A. v. Needville Indep. Sch. Dist.*,
  701 F. Supp. 2d 863 (S.D. Tex 2009) ...................................................................18

*Adkins v. Kaspar*,
  393 F.3d 559 (5th Cir. 2004) .............................................................................11

*Allen v. S.C. Dep't of Corr.*,
  No. 3:10-cv-939-HMH, 2011 WL 2193289 (D.S.C. May 12, 2011) ...................14

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005)......................................................................................12, 19

*Elrod v. Burns*,
  427 U.S. 347 (1976)............................................................................................18

*Emp't Div. v. Smith*,
  494 U.S. 872 (1990)......................................................................................12, 15

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) .............................................................................19

*Haight v. Thompson*,
  763 F.3d 554 (6th Cir. 2014) ........................................................................12, 14

*Harris v. Wall*,
  217 F. Supp. 3d 541, 560 (D.R.I. 2016).............................................................18

*Jehovah v. Clarke*,
  798 F.3d 169 (4th Cir. 2015) .................................................................12, 13, 17

*Jolly v. Coughlin*,
  76 F. 3d 468 (2d Cir. 1996)................................................................................18

*Knowles v. Pfister*,
  829 F. 3d 516 (7th Cir. 2016) ............................................................................18

*Lovelace v. Lee*,
  472 F.3d 174 (4th Cir. 2006) .................................................................11, 14, 16

*Madison v. Riter*,
  355 F.3d 310 (4th Cir. 2003) .............................................................................11

*Midrash Sephardi, Inc. v. Town of Surfside*,
  366 F.3d 1214 (11th Cir. 2004) .........................................................................11

*Monaghan v. Sebelius*,
  931 F.Supp.2d 794 (E.D. Mich. 2013)...............................................................20

*Morrison v. Garraghty*,
  239 F.3d 648 (4th Cir. 2001) ...........................................................................15

*Murphy v. Mo. Dep't of Corr.*,
  372 F.3d 979 (8th Cir. 2004) ...........................................................................11

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) ...........................................................................18

*Pell v. Procunier*,
  417 U.S. 817 (1974)...........................................................................................10

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*,
  584 F. Supp. 2d 766 (D. Md. 2008)..................................................................18

*Real Truth About Obama, Inc. v. FEC*,
  575 F.3d 342 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).....................9

*Sample v. Lappin*,
  424 F. Supp. 2d 187 (D.D.C. 2006) ..................................................................12

*Shaw v. Hunt*,
  517 U.S. 899 (1996)...........................................................................................14

*Sherbert v. Verner*,
  374 U.S. 398 (1963)...........................................................................................11

*Staples v. Gerry*,
  No. 14-cv-473, 2015 WL 2452996 (D.N.H. May 11, 2015) ............................18

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
  450 U.S. 707 (1981)...........................................................................................11

*Turner v. Safley*,
  482 U.S. 78 (1987)........................................................................................16, 17

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ........................................................................19

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ............................................................................14

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...............................................................................................9

iii

**Statutes**

42 U.S.C. § 1983 .................................................................................................10, 13

42 U.S.C. § 2000cc *et seq*. .............................................................................1, 10, 19

National Prohibition Act, Title II, § 3, 41 Stat. 308 ....................................................15

**Other Authorities**

146 Cong. Rec. S6678-02 (daily ed. July 13, 2000) ...............................................10, 20

146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) ...............................................10, 20

Chapter D, Section .0203(b), "Visitors," State of North Carolina Department of
   Public Safety Prisons, Policy & Procedures .....................................................8, 15

Chapter H, Section .0106(i), "Religious Services," State of North Carolina
   Department of Public Safety Prisons, Policy & Procedures ........................................8

The Large Catechism ...............................................................................................3

Theology and Practice of the Lord's Supper Part I:  Report of the Commission on
   Theology and Church Relations of the Lutheran Church Missouri Synod...............................3

Remarks of President William J. Clinton on Signing of Law S. 2869, the
   Religious Land Use and Institutionalized Persons Act of 2000, 2000 .....................................1

U.S. Constitution.................................................................................... *passim*

Plaintiff James Kelliher hereby moves this Court to enter a preliminary injunction[1] against the North Carolina Department of Public Safety ("DPS"), Johnny Hawkins, Kenneth Lassiter, Erik A. Hooks, and Betty Brown (collectively, "Defendants") from prohibiting Plaintiff from (1) partaking in sacramental wine at the Lord's Supper, (2) meeting with his pastor on a weekly basis, and (3) consulting the Lutheran Hymnal and Sunday Sermon pamphlet.

## PRELIMINARY STATEMENT

Religious liberty is a bedrock principle of American life. As such, our nation's framers and Congress have seen fit to protect the religious freedoms of all persons, specifically including incarcerated persons, like Plaintiff. *See* 42 U.S.C. § 2000cc-1(a) ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . ."); *see also* U.S. Const. amend 1 ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."); *see also* Remarks of President William J. Clinton on Signing of Law S. 2869, the Religious Land Use and Institutionalized Persons Act of 2000, 2000 WL 1371281, at *1 (Sept. 22, 2000) ("Religious liberty is a constitutional value of the highest order, and the Framers of the Constitution included protection for the free exercise of religion in the very first Amendment. This Act recognizes the importance the free exercise of religion plays in our democratic society.").

---

[1] Plaintiff acknowledges that in its order granting Plaintiff leave to amend his complaint, the Court reasoned that the injunctive relief Plaintiff has requested in the Amended Complaint would be denied at the time because "defendants' responsive pleadings or motions under Rule 12 may establish that these restrictions are related to proper penal interests." ECF No. 18. Defendants filed their Rule 12 responsive pleading on November 21, 2017. *See* ECF No. 30 (the "Answer"). Defendants' Answer offers ***no explanation*** for the policies and restrictions that Plaintiff challenges in this action, or any statement that the policies and restrictions Defendants have imposed on the practice of Plaintiff's religious beliefs are related to any proper penal interest. Accordingly, this preliminary injunction motion is timely.

At its core, the issue presented here is simple: Plaintiff wishes to be visited on a weekly basis by his pastor and partake in the Lord's Supper—through the consumption of wafers and less than an ounce of consecrated wine, and consultation of the Sunday sermon pamphlet and Lutheran Hymnal—so that he may practice his faith, and in so doing carry out his sincerely held religious beliefs. Defendants' policies and enforcement of those policies—through limitation of clergy visits and disallowance of wine and written materials at visitation periods—have substantially burdened Plaintiff's practice of his religion. As explained below, Plaintiff has been practicing his Missouri Synod Lutheran faith for over a decade. Throughout the entire time, Plaintiff has been incarcerated in North Carolina correctional facilities, certain of which allowed Plaintiff to partake in the Lord's Supper at visitations. While at Nash Correctional Institution, Defendants have denied Plaintiff such visitations.

Plaintiff's practice of his Lutheran beliefs is essential not only to his constitutionally protected right to free exercise, but also to his rehabilitation in prison. Each day that passes while Plaintiff has been denied his right to practice his faith is a new and unjust offense to Plaintiff's right to practice his religious beliefs. Defendants' unconstitutional and illegal actions have continued for too long, and thus a preliminary injunction is necessary to prevent the continuing irreparable harm that Plaintiff has endured.

## **STATEMENT OF FACTS**

Plaintiff was confirmed as a Missouri Synod Lutheran on January 10, 2007, by Pastor Tod Rappe. Declaration of James Kelliher ("Decl.") ¶ 1. As such, Plaintiff follows Martin Luther's teachings, as explained in the Large Catechism, concerning the Ten Commandments, the Apostle's Creed, the Our Father, Baptism, and the Sacrament of the Altar, which includes the Lord's Supper (also referred to as Holy Communion). *Id.* ¶ 2.

2

As part of the Lord's Supper, Plaintiff sincerely believes in consubstantiation and believes he is commanded to partake of the Lord's Supper weekly, at a minimum, to receive the forgiveness of sins, and to practice Christianity in accordance with his beliefs. *Id.* ¶ 3.

The Large Catechism instructs that the Lord's Supper be taken with wine as the Bible commands. Further, the Large Catechism provides questions and instructions regarding the Sacrament of the Alter, including:

> Now what is the Sacrament of the Altar?
>
> Answer: **It is the true body and blood of our Lord Jesus Christ, in and under the bread and wine which we Christians are commanded by the Word of Christ to eat and to drink.** And as we have said of Baptism that it is not simple water, so here also we say the Sacrament is bread and wine, but not mere bread and wine, such as are ordinarily served at the table, but bread and wine comprehended in, and connected with, the Word of God.

Martin Luther, *The Large Catechism* 71 (emphasis added).[2]

Reverend Christopher S. Esget, the Sixth Vice President of the Missouri Synod Lutheran Church, further confirmed Plaintiff's beliefs by letter sent on December 2, 2016, in which Reverend Esget stated:

> Frequent reception of Holy Communion (the Sacrament of the Altar) is an obligation of all our members. This is the official teaching of our denomination. Proper use of the Sacrament requires wine (grape wine with alcohol) administered by a pastor.
>
> James Kelliher is a member of the congregation of the Lutheran Church—Missouri Synod. Under the aegis of our church, Rev. Tod Rappe, a pastor in good standing in our church body, is ministering to him.

Dec. 2, 2016 Letter from Esget (*see* Compl. Ex. 1).

---

[2] *See also Decl.* ¶ 3. Plaintiff sincerely believes, consistent with Lutheran teaching, that substituting other liquids, like grape juice, for wine is an impermissible innovation that calls into doubt whether the instructions of Jesus Christ are being followed. *See id.* ¶ 8; *see also Theology and Practice of the Lord's Supper Part I: A Report of the Commission on Theology and Church Relations of the Lutheran Church Missouri Synod* at II.B.2.b (May 1983) ("The substitution of grape juice raises the question of whether the Lord's instruction is being heeded.").

Plaintiff was previously incarcerated by DPS at Alexander Correctional Institution, Wayne Correctional Institution, and Pender Correctional Institution ("Pender"). Decl. ¶ 11. In May 2016, Plaintiff was transferred from Pender to Nash at his request to be closer to his family. *Id.* ¶ 12.

From at least January 2010 until Plaintiff's May 2016 transfer to Nash, Pastor Rappe provided Plaintiff access to the Lord's Supper, Lutheran Hymnal, and the Sunday Sermon pamphlet during weekly visits to Plaintiff. *Id.* ¶ 13.

The Lutheran Hymnal, Sunday Sermon pamphlet (which contains weekly Gospel readings according to the liturgical calendar from which Pastor Rappe preaches), and Pastor Rappe's instructions, prepare Plaintiff to receive the Lord's Supper, and thus are necessary elements to the Sacrament of the Altar. *Id.* ¶ 14.

Until being transferred to Nash, Plaintiff was permitted to receive the Lord's Supper from Pastor Rappe, who consecrated the bread and wine, transforming the bread into the Body of Jesus Christ and transforming the wine into the Blood of Jesus Christ. *Id.* ¶ 15. Pastor Rappe was permitted to provide wafers as bread and wine, which was poured into a small plastic cup of about 0.5 ounce size. *Id.* Until Plaintiff was transferred to Nash, Pastor Rappe administered these services to Plaintiff weekly, and Plaintiff was never limited to only one clergy visit per month. *Id.* ¶ 16. Pastor Rappe has been, and continues to be, willing and able to administer these services to Plaintiff at Nash. *Id.* ¶ 17.

But after being transferred to Nash, Plaintiff's religious observances were curtailed: Plaintiff is prohibited from partaking in sacramental wine; Pastor Rappe's clergy visitations are limited to once a month; and Pastor Rappe is not permitted to bring the Lutheran Hymnal and Sunday Sermon pamphlet into Nash (these religious texts being deemed "contraband"). *Id.* ¶ 18.

4

In response to these prohibitions, Pastor Rappe spoke to Defendant Hawkins on May 27, 2016, after a visitation session with Plaintiff. Defendant Hawkins informed Pastor Rappe that he would meet with an administrative board to discuss the situation regarding Plaintiff's practice of his religion. *Id.* ¶ 19. At a later date, without explanation, Defendant Hawkins informed Pastor Rappe that Plaintiff would continue to be denied weekly clergy visits, limiting Pastor Rappe's clergy visits to once a month. *Id.*

Nash does not provide any services for Lutherans generally, or to Missouri Synod Lutherans specifically, and Nash does not have a Chaplain on staff. *Id.* ¶ 20; see also Answer ¶ 30 (admitting that "Neither Lutherans no Missouri Synod Lutherans have a separate corporate service in any NCDPS correctional facility.").

Plaintiff wrote to Defendant Hawkins on June 6, 2016, and again on June 20, 2016, to inform him of his sincere beliefs regarding the practice of his religion and the importance of his request to partake in the Lord's Supper, including the sacramental wine, and to use the Lutheran Hymnal and Sunday Sermon pamphlet when practicing his faith. Decl. ¶ 21. Defendant Hawkins did not respond to Plaintiff's letters. *Id.*

On July 11, 2016, Plaintiff filed (and on July 16, 2016, DPS received) a Grievance. *See* Grievance No. 3710-2016-2CL-02106 ("July 2016 Grievance") (*see* Compl. Ex. 2). In it, Plaintiff stated that DPS's "state-wide policy banning inmates from receiving the 'Lord's Supper' (bread [and] wine) clearly infringes on [his] ability to practice [his] religion as a Missouri Synod Lutheran." *Id.* On that same day, Plaintiff received a response signed by Angelo Wiggins stating that "DPS Policy prohibit visiting clergy from bringing sacraments or the Lord's Supper into facility. Base [sic] on all facts no further action is needed or necessary." *Id.* On appeal to Defendant Hooks, Secretary of DPS, Plaintiff received a response signed by

5

Vivian L. Brake on July 22, 2016, stating: "I have reviewed the Step #1 response regarding your complaint. It appears that your complaint has been appropriately addressed in accordance to DPS policy. No further action required at this time." *Id.*

On July 25, 2016, in a "Findings and Disposition Order" signed by Reginald R. Mewborn, Inmate Grievance Examiner, DPS stated that an investigation of Plaintiff's complaint was conducted, and that staff "concluded that the inmate has not been treated unfair or outside the scope of correctional policies and procedures." *See* Compl. Ex. 2. Mr. Mewborn stated that, based upon his review, "there is no supporting evidence that staff has violated any applicable policy. Accordingly, this grievance must be dismissed." *Id.* Thereafter, Plaintiff wrote to Defendant Betty Brown, the DPS Chaplain on August 19, 2016. *See id.* Plaintiff explained that he had received the Lord's Supper at three other North Carolina correctional facilities, and reiterated that participation in the Lord's Supper is a necessary and central tenet of his faith. *See id.* No response was ever received. Also on August 19, 2016, Plaintiff wrote to George Solomon (then DPS's Director of Prisons and predecessor o Defendant Lassiter) describing the July 2016 Grievance response and requesting a written copy of DPS's policy concerning clergy visitation and sacramental wine. *See id.* Again, no response was ever received. On August 22, 2016, Plaintiff wrote to Mr. Mewborn regarding Mr. Mewborn's review of Plaintiff's July 2016 Grievance. *See id.* In light of Plaintiff's previous participation in the Lord's Supper at three other North Carolina correctional facilities, Plaintiff expressed his disbelief in the existence of a policy that prohibits such activity. *See id.* Plaintiff again requested the policy regarding clergy visitation and sacramental wine. *See id.*

On August 31, 2016, Ina M. Hinton, responding from the Inmate Grievance Resolution Board, wrote to acknowledge Plaintiff's "disagreement with the Grievance Examiner's decision

6

related to your grievance appeal." Ms. Hinton stated that "[t]his issue has been addressed at every level of the Administrative Remedy Procedure. Therefore, you have exhausted your administrative remedies. If you continue to have concerns regarding this issue, you may pursue your concerns through other avenues." *See id.*[3]

On August 30, 2016, Plaintiff filed an "Inmate Request for Religious Assistance Fact Sheet." *See* Inmate Request for Religious Assistance Fact Sheet (*see* Compl. Ex. 3) ("Religious Assistance Fact Sheet"). In his Religious Assistance Fact Sheet Plaintiff stated:

> The Sacrament of the Altar (Lord's Supper) is the point of contention so I'll focus on this key tenet. We receive, in the Lord's Supper, a great 'treasure': the forgiveness of sins. The whole Gospel is comprehended in this Sacrament and is offered to us through the Word, which promises that in and under the bread and wine we receive the body and blood that was sacrificed on the cross for our salvation. Those who believe the Words of promise receive the forgiveness this Sacrament promises. Luther urges Christians to receive the Sacrament frequently.

Also in his Religious Assistance Fact Sheet, Plaintiff explained his sincere belief regarding what occurs to those who do not partake of the Lord's Supper:

> Luther writes that the '[Devil] tries every trick and does not stop until he finally wears us out; so that we either renounce our faith or throw up our hands and put up our feet, becoming indifferent or impatient. [Some] pretend that it is enough to believe without it. For the most part, they go so far astray that they become quite brutish and finally despise both the Sacrament and God's Word. Nevertheless it must be known that people who deprive themselves of and withdraw from the Sacrament for such a long time are not to be consecrated Christians.'

In response to Plaintiff's request for religious accommodation via his Religious Assistance Fact Sheet, DPS wrote to Plaintiff indicating that "it appears that you are being accommodated thru [sic] Christian services held on Sunday Mornings and the quarterly

---

[3] Despite the explicit exhaustion of Plaintiff's remedies, Plaintiff took further action by filing another grievance on September 14, 2016. *See* Grievance No. 3710-2016-2CU-02223 (Compl. Ex. 7). This grievance was also denied and Plaintiff was encouraged to attend non-denominational Christian worship services, and was told that visitors are only allowed to bring car keys and identification when visiting.

observance of the Lord's Supper/Holy Communion. NCDPS policy and procedure does not allow room for accommodations in the following requested areas: Inmate partaking in the consumption of alcoholic beverage (Sacramental Wine) and bringing in contraband items into the facility via approved visit(s) (Sunday sermon pamphlet, Lutheran Hymnal and Lord's Supper)." Sept. 20, 2016, Letter Regarding Religious Accommodation (*see* Compl. Ex. 4).

Further, on October 4, 2016, Susan Addams, the Regional Chaplain for DPS acting under DPS's authority wrote to Plaintiff to state that she found "this is an inappropriate use of the [Religious Assistance Fact Sheet]" and that the direction given to Plaintiff in the September 20, 2016 letter (Compl. Ex. 4) was correct. Oct. 4, 2016 Letter Regarding Submission of DC-572 (*see* Compl. Ex. 5).

> Chapter H, Section .0106(i), of DPS's Religious Services Policy provides:
>
> Sacramental wine may be approved for religious services. Requests must be made to the facility chaplain or other designated staff and will be reviewed on a case-by-case basis. Only the religious official leading the rite may consume alcohol. Inmates are not allowed to consume ANY alcoholic beverages while in the custody of the Department of Public Safety.

Chapter H, Section .0106(i), "Religious Services," State of North Carolina Department of Public Safety Prisons, Policy & Procedures. This provision, in its current form, was issued on September 1, 2016, superseding a substantially similar policy that issued on July 7, 2015, and was signed by George Solomon, who was then the DPS's Director of Prisons and is the predecessor of Defendant Lassiter.

In addition, DPS "recognizes the important roll [sic] that the clergy has on an inmate's rehabilitation. When a clergy visit is scheduled, the facility should allow the visit to be conducted in a private setting if possible. The clergy visit should not be counted as the standard one visit per week that inmates are allowed." Chapter D, Section .0203(b), "Visitors," State of

North Carolina Department of Public Safety Prisons, Policy & Procedures ("DPS Visitation Policy").

On DPS's website, under Chaplaincy Services, DPS recognizes that among its administrative responsibilities is to "address religious issues of all faiths" and includes in its mission statement its obligation "[t]o serve as a consultant for management regarding inmate requests for religious services and other issues[.]"  Chaplaincy Services, NC DPS, *available at* https://www.ncdps.gov/Adult-Corrections/Prisons/Programs/Chaplaincy-Services (last visited on Dec. 6, 2017).

In order to gain clarity on a policy that diverged with Plaintiff's personal experience of being able to receive sacramental wine in other North Carolina correctional institutions, Plaintiff contacted Bobbie Richardson, the Representative for the seventh district of North Carolina in the North Carolina House of Representatives.  Rep. Richardson responded, stating that her office had inquired with DPS regarding Plaintiff's issues and history.  According to Rep. Richardson,

> Per [Defendant] Brown's inquiry, the facilities where inmate Kelliher had been located, all stated they did not allow Rev. Rappe to give communion to the inmate during visitation.  It was later discovered that while at Pender Correctional Institution, a Temporary Chaplain did allow Rev. Rappe to give communion to inmate Kelliher during visitation.  The number of times communion was given is not known.  This action was not in compliance with NCDPS Visitation or Religious Policy.  The Temporary Chaplain was advised this action was not in compliance with policy.  The chaplain was advised this action should not have occurred.

June 8, 2017 Letter from Richardson (Compl. Ex. 6).  As part of this correspondence, Defendant Brown admitted that a Roman Catholic priest is permitted to celebrate mass, during which prisoners are permitted to partake of sacramental wine.  *See id.*

It is Plaintiff's sincere belief that Defendants' prevention of Plaintiff's ability to receive the Lord's Supper regularly, through weekly visits from Pastor Rappe, and consultation with the Sunday Sermon pamphlet and the Lutheran Hymnal, amounts to a prevention of the practice of

9

his religion and a prevention of his receiving forgiveness of sins—imperiling his soul. Decl. ¶35.

## ARGUMENT

A court may grant a preliminary injunction if the moving party demonstrates "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). As shown below, Plaintiff demonstrates each requirement, and the requested injunctive relief should thus be granted.

## I. PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiff has asserted two substantive claims in his Complaint: violation of RLUIPA (42 U.S.C. § 2000cc *et seq*.) and violation of the First and Fourteenth Amendments to the U.S. Constitution (actionable through 42 U.S.C. § 1983). As a result of Defendants' adoption and enforcement of policies that substantially burden the exercise of Plaintiff's protected religious freedom, Plaintiff is able to demonstrate substantial likelihood of success on the merits of both of his claims.

### A. *Plaintiff Is Likely to Succeed on the Merits of His RLUIPA Claim.*

RLUIPA provides that no government institution, including correctional facilities, "shall impose a substantial burden on the religious exercise of a [prison inmate]." 42 U.S.C. § 2000cc-1(a). This prohibition includes any substantial burden on religious exercise resulting from "a rule of general applicability." *Id.* "Religious exercise" is broadly defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.*

10

§ §2000cc-5(7)(A). To justify a substantial burden on religious exercise, the government must demonstrate that the burden is: (1) "in furtherance of a compelling governmental interest"; ***and*** (2) "the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000cc-1(a).

The purpose of RLUIPA is to promote the important penological interest in rehabilitating inmates in the custody of state and federal prisons. *See, e.g.*, *Pell v. Procunier*, 417 U.S. 817, 822-25 (1974); 146 Cong. Rec. S6678-02, S6689 (daily ed. July 13, 2000) (statement of Senator Kennedy) ("Sincere faith and worship can be an indispensable part of rehabilitation."); 146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (joint statement of Senators Hatch and Kennedy) (describing purpose of and need for RLUIPA).

In *Lovelace v. Lee*, the Fourth Circuit acknowledged that RLUIPA mandates a "'more searching standard' of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." 472 F.3d 174, 186 (4th Cir. 2006) (citing *Madison v. Riter*, 355 F.3d 310, 314-15 n.1 (4th Cir. 2003)). The Fourth Circuit noted that "[i]n addition to prescribing strict scrutiny, Congress mandated that RLUIPA be construed in favor of broad protection of religious exercise . . . . Congress, in other words, intended to provide ***as much protection as possible to prisoners' religious rights*** without overly encumbering prison operations." *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 987 (8th Cir. 2004)).

A "substantial burden" on the exercise of religion is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 187 (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)); *see also Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (A substantial burden is one that forces a person to "choose between

following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand."); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) ("result[ing] from pressure that tends to force adherents to forego religious precepts or . . . [tends to] mandate [ ] religious conduct"); *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) (a "substantial burden" under RLUIPA is one which "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.").

The Supreme Court has reasoned that "the 'exercise of religion' often involves not only belief and profession but the performance of . . . physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine[.]" *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (citing *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990)). In accordance with the statutory language of RLUIPA and the purpose of RLUIPA, courts have found that an inmate who expresses the sincere belief that partaking in sacramental wine is necessary to the practice of his religion should be permitted to do so. *See, e.g.*, *Haight v. Thompson*, 763 F.3d 554, 566 (6th Cir. 2014) ("RLUIPA thus does not permit a prison warden to deny a Catholic inmate access to wine for a communion service on the ground that grape juice is a reasonable substitute or to deny grape juice to a Presbyterian inmate on the ground that water is a reasonable substitute."); *cf. Sample v. Lappin*, 424 F. Supp. 2d 187, 193-195 (D.D.C. 2006) (analyzing RFRA claim and refusing to grant summary judgment, finding that it was not a material disputed fact that plaintiff's sincere belief required him to consume wine as an important part of his observances, but also finding that there were material issues of fact with respect to whether an outright ban of alcohol is the least restrictive means of achieving the government's stated interest).

Indeed, in refusing to affirm a grant of summary judgment to the government on an inmate's RLUIPA and Free Exercise claims based on the prohibition of sacramental wine, the Fourth Circuit recognized the important role that sacramental wine can have in the exercise of religion. In *Jehovah v. Clarke*, an inmate, Jehovah, claimed that policies adopted by the Virginia Department of Corrections ("VDOC") had prevented him from "taking communion in the manner required by his religious beliefs." 798 F.3d 169, 173 (4th Cir. 2015). Jehovah's beliefs mandated that "he take communion by drinking red wine and consuming bread dipped in honey, olive oil, sugar, cinnamon, and water," yet VDOC policies prohibited inmates from consuming communion wine. *Id.* at 173-74. Considering an appeal from the district court's dismissal of Jehovah's RLUIPA and § 1983 claims on summary judgment, the Fourth Circuit reversed the district court, finding that under both the RLUIPA standard of review and the more deferential § 1983 standard of review, "a reasonable jury could rule in Jehovah's favor." *Id.* at 177.

Here, Plaintiff has demonstrated his sincere belief in the teachings of the Missouri Synod Lutheran Church, and his belief that regular participation in the Lord's Supper is a necessary part of the practice of his faith. In order to participate in the Lord's Supper, Plaintiff believes that it is necessary for him to meet with his pastor, review the weekly message, and partake in a small amount of sacramental wine that has been consecrated by his pastor. At other North Carolina correctional facilities, in light of Plaintiff's sincere belief, Plaintiff's request to partake of the Lord's Supper (as administered by his pastor) was accommodated—a fact conceded by Defendant Brown. *See* Compl. Ex. 6. But through formally adopted policies, denials of formal grievances, and informal prohibitions, Defendants have deprived Plaintiff (since his transfer to Nash) of the ability to: (1) meet with his pastor on a weekly basis; (2) review the Sunday sermon pamphlet and Lutheran Hymnal when visiting with his pastor; and (3) partake in the sacrament

of the Lord's Supper when visiting with his pastor. Because Plaintiff has expressed time and again that participation in the Lord's Supper is an essential tenet of his faith and to not participate is to imperil his soul, each of these deprivations and denials places a substantial burden on Plaintiff's sincerely held beliefs.

Because Plaintiff has demonstrated the substantial burden that Defendants' policies and interpretations of those policies place on his religious exercise, the burden of persuasion shifts to the Defendants to show that their policies are the least restrictive means of furthering a compelling government interest. *See Lovelace*, 472 F.3d at 189; *Allen v. S.C. Dep't of Corr.*, No. 3:10-cv-939-HMH, 2011 WL 2193289, at *2 (D.S.C. May 12, 2011) ("Once a plaintiff produces *prima facie* evidence to support the claim that the challenged practice or law substantially burdens the plaintiff's exercise of religion, the government bears the burden of persuasion on whether the practice or law is the least restrictive means of furthering a compelling governmental interest."). Courts have found that the oft-offered arguments that such an accommodation "would be a first" or would allow for an onslaught of exceptions are not sufficiently compelling government interests. *See, e.g.*, *Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014). Further, it bears reminding, that "[o]nly the ***true explanations*** for the policy count" when analyzing the purported compelling interests that motivate the policy's adoption. *Id.* (emphasis added) (citing *Shaw v. Hunt*, 517 U.S. 899, 908 n. 4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the . . . 'actual purpose' for the [government's action].")). As of yet, Defendants have failed to offer Plaintiff any compelling government interest for the policies and course of action they have adopted that substantially burden the practice of Plaintiff's faith.

Moreover, even if a compelling government interest were presented, Defendants can only meet their burden to prove that their actions are the least restrictive means if they "demonstrate[] that [they have] actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005). Logic instructs that to limit a clergy member's visitation of an inmate to only once a month or to prohibit clergy from bringing religious texts to visitations cannot possibly be the "least restrictive means." What government interest is served by disallowing clergy to visit on a more frequent basis?[4] Indeed, the very enactment of RLUIPA shows that Congress believed in the value of institutionalized persons' participation in religious activity—which naturally includes clergy visits. Further, to prohibit a clergy member from bringing in a hymnal and pamphlet to help deliver the church's weekly message, when that clergy member would take that same hymnal and pamphlet off the premises at the conclusion of the visitation, cannot logically be the least restrictive means of serving whatever government interest is served by disallowing religious texts to be brought to visitations. And finally, while Plaintiff is cognizant of generalized (though unarticulated in this case) concerns regarding prisoners' alcohol use, when a mere half-ounce sip of alcohol, administered by a clergy member, is all that is requested in order to satisfy Plaintiff's religious practices, a complete and utter ban on partaking in sacramental wine is not the least restrictive means available.[5]

---

[4] The hypocrisy of this limitation on clergy visits is especially perplexing in light of the explicit DPS policy that instructs that clergy visits are not to be counted in the total number of monthly visits, unlike visitations from an inmate's family and friends. *See* Chapter D, Section .0203(b), DPS Visitation Policy ("The clergy visit should not be counted as the standard one visit per week that inmates are allowed.").

[5] As Justice Blackmun noted in his dissent in *Employment Division v. Smith*, the use of sacramental wine in religious practices has always been protected, and even "[d]uring Prohibition, the Federal Government exempted such use of wine from its general ban on possession and use of alcohol." 494 U.S. at 913 n.6 (Blackmun, J. dissenting) (citing National

15

**B.    *Plaintiff Is Likely to Succeed on the Merits of His Free Exercise Claim.***

"The Free Exercise Clause of the First Amendment forbids the adoption of laws designed to suppress religious beliefs or practices." *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001). This encompasses policies that impose a substantial burden on a prisoner's right to practice his religion. *See Lovelace v. Lee*, 472 F.3d 174, 198 & n.8 (4th Cir. 2006). A prison regulation is reasonable, and thus permissible, if it satisfies the four factors established in *Turner v. Safley*, 482 U.S. 78 (1987). That test asks: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action. *Lovelace*, 472 F.3d at 200 (citing *Turner*, 482 U.S. at 89-92).

As stated above, there must be a valid, rational connection between the prison regulation at issue and the government interest presented. To date, in response to Plaintiff's grievances, the Defendants have not put forth *any* interest furthered by the regulation that is being enforced here, nor have they demonstrated a rational connection between the regulations at issue and any interest that has yet to be offered.

Further, as detailed above, as a result of Defendants' prohibition that Plaintiff visit with clergy on a weekly basis and receive the Lord's Supper in those visitations, Plaintiff has no

---

Prohibition Act, Title II, § 3, 41 Stat. 308). Justice Blackmun further reasoned that "[h]owever compelling the Government's then general interest in prohibiting the use of alcohol may have been, it could not plausibly have asserted an interest sufficiently compelling to outweigh Catholics' right to take communion." *Id.* Plaintiff's right to partake in the Lord's Supper is directly analogous to a Catholic's right to take communion.

alternative means of practicing his Missouri Synod Lutheran beliefs, as there is no communal Missouri Synod Lutheran services where Plaintiff can receive the Lord's Supper and read the weekly message communicated in the Sunday Sermon Pamphlet. Defendants cannot credibly claim that to allow Plaintiff to meet with clergy at visitation and partake in the Lord's Supper is too burdensome on security staff and the allocation of prison resources because Defendant Brown has admitted that Plaintiff was previously permitted to partake in the Lord's Supper during visitations with Pastor Rappe while Plaintiff was incarcerated at Pender. *See* Compl. Ex. 6. If such an accommodation was not burdensome at Pender, it is not burdensome at Nash. Finally, there exists an easy and obvious alterative to the unconstitutionally restrictive policies that Defendants seek to enforce: grant Plaintiff the *same* accommodation he was previously afforded and allow him to partake of the Lord's Supper and read the hymnal and pamphlet during visitations with Pastor Rappe.[6]

It is here that the Fourth Circuit's ruling in *Jehovah* is, again, instructive. Assessing Jehovah's First Amendment claim, the Fourth Circuit applied the *Turner* test to ascertain whether a reasonable jury could find in Jehovah's favor regarding his First Amendment claim based upon a ban on communion wine. *See Jehovah*, 798 F.3d at 177-78. While the Fourth Circuit acknowledged that safety and security concerns may be legitimate penological interests, the Fourth Circuit found that the other *Turner* factors could not be satisfied in Jehovah's case, namely: (1) there was no available alternative means for Jehovah to practice his faith; (2) the record was silent on the impact of accommodation, but a reasonable jury could find that "exempting Jehovah from the ban would have a minimal impact on prison resources;" and (3)

---

[6] Further, it is not difficult to imagine other less restrictive alternatives to Defendants' complete ban on alcohol, including subjecting wine distribution to the same security measures as medication distribution or applying a ban on wine only to inmates who have a documented history of alcohol abuse.

Jehovah had posed several reasonable alternatives to the ban (including subjecting wine usage to the same security measures used for medication). *Id.* at 178-79.

*Jehovah* instructs the same result here. Because Plaintiff is able to demonstrate the four factors required for injunctive relief as required by *Turner*, Plaintiff is likely to succeed on the merits of his First Amendment claim.

## II. PLAINTIFF IS LIKELY TO SUFFER IRREPARABLE HARM OUTWEIGHING ANY HARM TO DEFENDANTS IN THE ABSENCE OF INJUNCTIVE RELIEF.

It is well established that a breach of constitutional rights—particularly religious rights—constitutes irreparable harm. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *A.A. v. Needville Indep. Sch. Dist.*, 701 F. Supp. 2d 863 (S.D. Tex 2009) (violation of plaintiff's constitutional rights to free exercise, freedom of speech, and due process constituted irreparable harm). "This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (finding irreparable harm when RLUIPA is violated); *Harris v. Wall*, 217 F. Supp. 3d 541, 560 (D.R.I. 2016) (citing *Staples v. Gerry*, No. 14-cv-473, 2015 WL 2452996, at *25-*26 (D.N.H. May 11, 2015) ("[T]he loss of religious freedom caused by a RLUIPA violation–standing alone–is sufficient to show irreparable harm and that the protection of religious practice is an important public interest."); *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 795 (D. Md. 2008) ("[T]he infringement of one's rights under RLUIPA constitutes irreparable injury."); *Jolly v. Coughlin*, 76 F. 3d 468, 482 (2d Cir. 1996) ("Courts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA [statute applying RLUIPA standard to federal government]"); *see also Knowles v. Pfister*, 829 F. 3d 516, 518 (7th Cir.

2016) (querying how forbidding religious observance could ever be thought to be harmless, reversing lower court's denial of preliminary injunction, and granting preliminary injunction).

To state the Plaintiff's position bluntly—it is his sincerely held belief, in accordance with his practice of the Missouri Synod Lutheran faith, that continued denial of regular participation in the Lord's Supper and reading of the Lutheran Hymnal and Sunday Sermon Pamphlet in his visitations with Pastor Rappe imperils his soul. Thus, it is patently unreasonable to find that no harm has occurred as a result of Defendants' enforcement of an unconstitutional policy.

## III. THE EQUITIES WEIGH IN FAVOR OF GRANTING PLAINTIFF INJUNCTIVE RELIEF.

Issuing an order requiring Defendants to allow Plaintiff regular visitations with a clergy member, where he may partake in the Lord's Supper and view the hymnal and pamphlet, will not harm Defendants. The fact that Plaintiff has previously been granted the relief he requests in this action when he was at other DPS institutions belies any claim that Defendants are incapable of or burdened by providing a small accommodation to Plaintiff so that he may practice his religious beliefs. Moreover, because Defendants' prohibition on Plaintiff's visitations with clergy violates RLUIPA and the First Amendment, an injunction will save Defendants from expending resources to train staff and otherwise implement a policy that is likely to be invalidated. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (enjoining implementation of a policy that is likely to be found a violation of law does not harm defendants). In short, an injunction will not burden Defendants.

## IV. THE PROPOSED INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST.

Enforcement of federal statutes is in the public interest. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest"). This principle especially applies to RLUIPA, which passed both houses of

Congress **unanimously** as "the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens." *Cutter*, 544 U.S. at 713. By its terms, RLUIPA is broadly construed in favor of religious liberty "to the maximum extent permitted by [the statute] and the Constitution." 42 U.S.C. § 2000cc-3g. In enacting RLUIPA, Congress recognized that "some institutions restrict religious liberty in egregious and unnecessary ways" (146 Cong. Rec. S7774-01, at S7775 (daily ed. July 27, 2000)), and noted that "[s]incere faith and worship can be an indispensible part of rehabilitation." 146 Cong. Rec. S6678-02, at S6688-89 (daily ed. July 13, 2000). By making these findings and enacting RLUIPA, Congress indicated that protection of prisoners' religious liberties is in the public interest. *See, e.g.*, *Monaghan v. Sebelius*, 931 F. Supp. 2d 794, 808-09 (E.D. Mich. 2013) (finding it in public interest that plaintiff not be compelled to act in conflict with his religious beliefs). An infringement upon any citizen's constitutionally protected right to practice his religion is a threatened infringement upon the public's same right. Thus it serves the public interest to fiercely protect the rights provided to the public at large by our nation's founders and Congress.

## CONCLUSION

For the reasons stated, the Court should grant Plaintiff's motion and issue a preliminary injunction ordering Defendants to refrain from prohibiting Plaintiff from (1) partaking in the sacramental wine at the Lord's Supper, (2) meeting with his pastor on a weekly basis, and (3) consulting the Lutheran Hymnal and Sunday Sermon pamphlet, pending adjudication of the matter on the merits.

Respectfully submitted,  December 14, 2017

KING & SPALDING LLP

*/s/ Chelsea Corey*
Chelsea Corey, NCSB No. 48838
100 North Tryon Street, Suite 3900
Charlotte, North Carolina 28202
E-mail:  ccorey@kslaw.com
Telephone:  (704) 503-2575
Telefax:  (704) 503-2622

and

Kevin O'Brien
1180 Peachtree Street, NE
Atlanta, Georgia 30309
E-mail:  kobrien@kslaw.com
Telephone: (404) 572-2442
Telefax: (404) 572-5100

*Attorneys for Plaintiff James Kelliher*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I electronically filed PLAINTIFF'S MEMORANDUM

OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION with the Clerk of

Court using the Court's CM/ECF system, which serves the registered parties via the CM/ECF

system on counsel of record:

        Kimberly D. Grande
        kgrande@ncdoj.gov
        Assistant Attorney General
        N.C. Department of Justice
        P.O. Box 629
        Raleigh, NC 27602
        ***Attorney for Defendants***

Dated: December 14, 2017

        KING & SPALDING LLP

        */s/ Chelsea Corey*
        Chelsea Corey, NCSB No. 48838
        100 North Tryon Street, Suite 3900
        Charlotte, North Carolina 28202
        E-mail: ccorey@kslaw.com
        Telephone: (704) 503-2575
        Telefax: (704) 503-2622

        and

        Kevin O'Brien
        1180 Peachtree Street, NE
        Atlanta, Georgia 30309
        E-mail: kobrien@kslaw.com
        Telephone: (404) 572-2442
        Telefax: (404) 572-5100

        ***Attorneys for Plaintiff James Kelliher***

22