IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:16-ct-3250-BO

| | |
|---|---|
| JAMES R. KELLIHER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| JOHNNY HAWKINS and GEORGE ) | |
| SOLOMON, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court to address plaintiff's motion seeking a preliminary injunction [D.E. 32]. For the following reasons, the court GRANTS the requested preliminary injunctive relief.

Background:

On September 8, 2017, plaintiff James R. Kelliher ("Kelliher") filed through counsel an amended complaint pursuant to 42 U.S.C. § 1983 asserting that he is a strict adherent to the faith of the Lutheran Church-Missouri Synod. Am. Compl. [D.E. 19] at 1. He alleges that North Carolina Department of Public Safety ("NCDPS") policies preclude him from (1) meeting with his pastor on a weekly basis; (2) consulting the Lutheran Hymnal and Sunday Sermon pamphlet at visitations with his pastor; and (3) partaking in sacramental wine when receiving the Lord's Supper. Id. at 1–2. He argues that these policies are a substantial burden on the practice of his religious beliefs and violate the First Amendment's Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5. Id.

Kelliher asserts that Pastor Tod Rappe ("Pastor Rappe") confirmed him in the Lutheran Church-Missouri Synod in January 2007, at a time when Kelliher was incarcerated at Alexander

Correctional Institution. Id. at ¶12. Kelliher expresses sincere beliefs in the religious tenets of the Lutheran Church-Missouri Synod including an individual obligation to frequently participate in the "Sacrament of the Alter" which incorporates the Lord's Supper, also known as Holy Communion. See id. at ¶¶ 13–18. In the Lutheran Church-Missouri Synod religious practice, on at least a weekly basis, a pastor administers the Lord's Supper to worshipers who personally consume bread and wine that, through a process known as consubstantiation, is the "true body and blood" of Jesus. See id. In this faith tradition, non-alcoholic grape juice is not an acceptable substitute. See id. at 15, 17, 18.

Kelliher asserts that, from January 2010 until his transfer to Nash Correctional Institution ("Nash") in May 2016, Pastor Rappe provided Kelliher "access to the Lord's Supper, Lutheran Hymnal, and the Sunday Sermon pamphlet during weekly visits." Id. at ¶ 21. Kelliher notes that the Hymnal and Sunday Sermon pamphlet "are necessary elements to the Sacrament of the Alter." Id. at ¶ 22. In these visits, Kelliher asserts that "Pastor Rappe was permitted to provide wafers as bread and wine, which was poured into a small plastic cup of about 0.5 ounce size." Id. at ¶ 24. Kelliher states that Pastor Rappe provides this individualized ministry to other inmates as well and is willing to continue to do so for Kelliher. Id. at ¶¶ 23, 26.

After Kelliher was transferred to Nash, pastoral visits were curtailed to once a month and the giving of the Lord's Supper, as well as the provision of the Lutheran Hymnal and the Sunday Sermon pamphlet, where discontinued entirely by prison staff. Id. at ¶¶ 27, 29. Kelliher filed a grievance in July 2016 to request the continuance of weekly pastoral meetings, and an NCDPS representative responded in a letter dated September 20, 2016, that he was already being accommodated the existence of weekly Christian services and by "the quarterly observance of the Lord's Supper/Holy Communion." Id. at ¶ 38. The letter goes on to state that "NCDPS policy and procedure does not

allow room for accommodations in the following requested areas: Inmate partaking in the consumption of alcoholic beverage (Sacramental Wine) and bringing in contraband items into the facility via approved visit(s) (Sunday sermon pamphlet, Lutheran Hymnal and Lord's Supper)." Id. Although Kelliher was denied the opportunity to partake in sacramental wine while receiving the Lord's Supper, he asserts that Nash inmates attend Roman Catholic Mass under the supervision of a priest and infers that these inmates do receive sacramental wine. See id. at ¶ 45.

Kelliher contends that "partaking in sacramental wine as part of the Lord's Supper, visiting with his pastor on a weekly basis, and consulting the Lutheran Hymnal and Sunday Sermon pamphlet, are 'religious exercise' as defined by 42 U.S.C. § 2000cc–5(7)(A)." Id. at ¶ 60. Kelliher asserts that Lutheran Church-Missouri Synod teachings do not permit the substitution of grape juice for wine and that such substitution would also substantially burden his religious practice. Id. at ¶ 63. He argues that NCDPS policies "prohibiting Plaintiff from partaking in the sacramental wine at the Lord's Supper, and meeting with his pastor on a regular (more than monthly) basis," do not serve a compelling governmental interest and that these policies are "not the least restrictive means of furthering any governmental interest, whether compelling or not." Id. at ¶¶ 65, 66.

On November 21, 2017, defendants filed an answer denying any violation of Kelliher's religious rights under federal law. See [D.E. 30] at ¶1. Defendants specifically deny that Kelliher regularly received Holy Communion while incarcerated and assert that, upon information and belief, a temporary chaplain at Pender Correctional Institution allowed Pastor Rappe to administer Holy Communion to Kelliher on a one-time basis. Id. at ¶¶ 24, 25. Defendants admit that, while at Nash, Kelliher "was not permitted to consume alcohol, including sacramental wine, and that Pastor Rappe was not able to bring in publications when visiting." Id. at ¶ 27. Defendants state that, although

3

"neither Lutherans nor Missouri Synod Lutherans have a separate corporate service in any NCDPS correctional facility," NCDPS does "offer a corporate service to all Christian faiths." Id. at ¶ 30.

Defendants admit that an NCDPS representative wrote the aforementioned September 20, 2016, letter. Id. at ¶ 38. Defendants admit that defendant Brown provided written confirmation that Nash allows a Roman Catholic priest to celebrate Mass with inmates but denies that defendant Brown's "communication states that inmates are permitted to consume wine as part of the service." Id. at ¶ 45. Defendants further admit that Kelliher has exhausted his administrative remedies, but only as to the relief requested in his July 2016 grievance. Id. at ¶ 47. Defendants generally deny that NCDPS imposed a substantial burden on Kelliher's religious exercise. Id. at ¶¶ 64, 70.

On December 14, 2017, Kelliher filed a motion seeking a preliminary injunction [D.E. 32], a memorandum [D.E. 33], and a declaration [D.E. 34] in support. Kelliher generally argues that the government has not shown that the NCDPS restrictions relate to a proper penal interest, and that, pursuant to RLUIPA, the NCDPS policies are not the least restrictive means of furthering any governmental interest. See [D.E. 33] at 15. Kelliher requests that defendants permit Pastor Rappe to: resume weekly visits; bring the Lutheran Hymnal and Sunday Sermon pamphlet during visits; and administer the Lord's Supper using less than one ounce of consecrated wine. Id. at 1, 2, 20. Kelliher addresses the doctrinal significance of the Lord's Supper and use of sacramental wine instead of a non-alcoholic substitute in Missouri-Synod Lutheran practice. Id. at 7–8. Kelliher avers a sincere belief that he is required to take the "Lord's Supper weekly, at a minimum," and that the "Lord's Supper [must] be taken with wine." Kelliher Decl. [D.E. 34] ¶¶ 3, 4. He also discusses the State's official clergy-visitation policy for prisons and notes, among other things, that NCDPS:

"recognizes the important roll [sic] that the clergy has on an inmate's rehabilitation.

4

> When a clergy visit is scheduled, the facility should allow the visit to be conducted in a private setting if possible. The clergy visit should not be counted as the standard one visit per week that inmates are allowed."

See [D.E. 33] at 8–9 (quoting Chapter D, Section .0203(b), "Visitors," State of North Carolina Department of Public Safety Prisons, Policy & Procedures ("DPS Visitation Policy")).

Kelliher argues that a preliminary injunction is appropriate because (1) he is likely to succeed on the merits of his claim, (2) he will suffer irreparable harm without this relief, (3) the equities weigh in his favor, and (4) the proposed injunction serves the public interest. See id. at 15–25.

On December 26, 2017, defendants filed a response in opposition to Kelliher's preliminary injunction motion. See Defs.' Resp. [D.E. 35]. Defendants argue: it is premature to determine the constitutionality of NCDPS policies before discovery and forthcoming motions allow the state an opportunity to provide a rationale demonstrating the penal interest of these policies; NCDPS policies do not impose a substantial burdened on Kelliher's religious exercise because he may meet with his pastor at least monthly, attend weekly corporate Protestant Christian services and quarterly Holy Communion services, receive approved religious materials in the mail, and engage in individual prayer; Kelliher has not met the high burden for imposing on the management of prisons nor shown that he meets the test for a preliminary injunctive relief; and any mandate from the court "that the NCDPS accept items which it has prohibited or deemed contraband would certainly implicate security and safety concerns," and that such decisions are best left to prison officials. Id. at 2–8.

Defendants also refer the court to the NCDPS policy statement regarding religious services. See id. at 4 (citing https://files.nc.gov/ncdps/documents/files/H%20.0100_09_01_16.pdf). This publically available document states, in pertinent part:

> (e) Any inmate may privately pray, meditate, and study scriptures or religious literature in his or her cell, so long as the inmate does not interfere with other

5

Case 5:16-ct-03250-BO   Document 49   Filed 04/02/18   Page 5 of 20

inmate(s), the inmate's assigned program or work assignments, security or operational management. . . .

(g) Clergy and other spiritual advisors may be admitted to visit an inmate at the inmate's request, subject to Prisons policies regarding visitation and coordination of the facility chaplain or other designated staff and approval of the facility head. . . .

(h) The facility Chaplain or designated staff may request assistance from a community religious official to perform a wedding, baptism, or other religious rites/rituals subject to Prisons policies regarding visitation policy. . . .

(i) The Chaplaincy Services Director shall maintain a list of faith groups approved for the use of sacramental wine. Sacramental wine may be approved for religious services. Requests must be made to the facility chaplain or other designated staff and will be reviewed on a case-by-case basis. Only the religious official leading the rite may consume alcohol. Inmates are not allowed to consume ANY alcoholic beverages while in the custody of the Department of Public Safety.

Chapter H, § .0106(e), (g), (h), (i), "Religious Services," State of North Carolina Department of Public Safety Prisons, Policy & Procedure.

Kelliher argues in his January 9, 2018, reply that defendants' response again fails to articulate a compelling governmental interest, or even a rationale, for the challenged policies. See [D.E. 40] at 2–5. Kelliher asserts that, contrary to defendants' arguments, "in accordance with RLUIPA and the First Amendment courts may issue mandatory preliminary injunctions (i.e., requiring affirmative action, rather than merely preserving the status quo) that affect these very sorts of 'day-to-day' decisions made by prison officials." Id. at 4–5 (citing, among other cases, Warsoldier v. Woodford, 418 F.3d 989, 1002 (9th Cir. 2005); Rouser v. White, 707 F. Supp. 2d 1055, 1073 (E.D. Cal. 2010)).

Kelliher further argues that the other religious outlets offered by NCDPS are insufficient. Id. at 6. To the extent that NCDPS policy allows Kelliher to receive religious publications through the mail, he asserts that these policies still restrict him from bringing previously mailed materials to any pastoral visitations, thus hindering his religious exercise. Id. Moreover, to the extent that the

6

defendants will allow Pastor Rappe to visit, but not on a weekly basis, Kelliher contends that this restriction is both arbitrary and contrary to the aforementioned NCDPS visitor policy specifically excluding pastoral visits from an inmate's total visitor count. Id. Finally, Kelliher reiterates that the weekly congregational services and quarterly Communion services offered by NCDPS do not allow him to participate in the Lord's Supper and consume sacramental wine on a weekly basis as his religious belief requires, effectively barring his faith-based conduct and causing a substantial burden on his religious exercise. See id. (citing Haight v. Thompson, 763 F.3d 554, 565 (6th Cir. 2014)).

On February 1, 2018, the court conducted a hearing on the pending motion. See [D.E. 45].

Standard of Review

In order to receive preliminary injunctive relief, a plaintiff must demonstrate the following: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The Supreme Court cautions that a preliminary injunction is "an extraordinary remedy never awarded as of right." Id. at 20 (citing Munaf v. Geren, 553 U.S. 674, 689–90 (2008)). Moreover, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Id. (internal citations and quotation marks omitted).

The Prison Litigation Reform Act (PLRA) circumscribes the relief that a court may grant with respect to prison conditions. See 18 U.S.C. § 3626; see also Wilkinson v. Austin, 545 U.S. 209, 230 (2005) (noting that any prospective relief granted to prisoners contesting a state prison policy

"must comply with the conditions set forth in 18 U.S.C. § 3626(a)(1)(A)"). Section 3626(a) of the PLRA states, in relevant part:

> (a)(1)(A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief. . . .
>
> (a)(2) . . . Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C. § 3626(a)(1)(A), (a)(2).

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend I. It is well established that prisoners retain constitutional rights, including First Amendment free exercise rights. See Pell v. Procunier, 417 U.S. 817, 822 (1974). The Free Exercise Clause precludes "the adoption of laws designed to suppress religious beliefs or practices" or "policies that impose a substantial burden on a prisoner's right to practice his religion," Wall v. Wade, 741 F.3d 492, 498 (4th Cir. 2014) (internal citations and quotation marks omitted); see also Employment Div., Dep't of Human Res. of Oregon v. Smith 494 U.S. 872, 876–77 (1990) ("The Free Exercise Clause of the First Amendment [ ] has been made applicable to the States by incorporation into the Fourteenth Amendment").

8

A prisoner's free exercise right is substantially burdened if a government policy "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quoting Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 718 (1981)). Nevertheless, "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." Wall, 741 F.3d at 499 (quoting Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005)). Moreover, even when a government policy is found to substantially burden a prisoner's religious exercise, a constitutional violation is only found if the policy is not reasonably related to a legitimate penological interest. Turner v. Safley, 482 U.S. 78, 89 (1987). Courts apply the following four Turner factors as a test:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

Beard v. Banks, 548 U.S. 521, 529 (2006) (internal citations and quotations omitted); see also O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (applying the Turner factors to a prisoner's Free Exercise Clause claim). In sum, a prisoner asserting that government polices violate his free exercise rights must show that: (1) he sincerely holds his expressed religious beliefs; (2) these policies substantially burden his religious exercise; and (3) these policies are not reasonably related to legitimate penological interests. See O'Lone, 482 U.S. at 349; Turner, 482 U.S. at 89–90; Thomas, 450 U.S. at 717–18; Wall, 741 F.3d at 498–99; Lovelace, 472 F.3d at 187.

"RLUIPA . . . protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation

9

for exercise of their religion." Cutter, 544 U.S. at 721; see also 42 U.S.C. § 2000cc–5(7)(A) (defining "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"). "Congress enacted RLUIPA . . . 'in order to provide very broad protection for religious liberty.'" Holt v. Hobbs, 135 S. Ct. 853, 859 (2015) (quoting Burwell v. Hobby Lobby Stores, Inc., 134 S.Ct. 2751, 2760 (2014)). Religious protections under RLUIPA are more expansive than those of the First Amendment. Id. at 860. RLUIPA, in relevant part, provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

A plaintiff alleging a RLUIPA violation bears the initial burden of showing that "the relevant exercise of his belief is grounded in a sincerely held religious belief," and that the government policy or action in question "substantially burdened that exercise of religion." Holt, 135 S. Ct. at 862. Under Fourth Circuit precedent, the "substantial burden" standard for a RLUIPA claim is the same as that for a First Amendment Free Exercise claim. See Lovelace, 472 F.3d at 187. Once an inmate makes this preliminary showing, the burden shifts to the government to show that the demonstrated substantial burden on an inmate's religious exercise both (1) furthers a compelling governmental interest and (2) is the least restrictive means of furthering that interest. Holt, 135 S. Ct. at 863 (citing 42 U.S.C. § 2000cc–1); accord Couch v. Jabe, 679 F.3d 197, 200 (4th Cir. 2012).

Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order,

10

security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently take[] into account any institutional need to maintain good order, security, and discipline." Couch, 679 F.3d at 201 (quotation omitted); see Holt, 135 S. Ct. at 866.

The Supreme Court has recognized that RLUIPA's "least-restrictive-means standard is exceptionally demanding." Burwell, 134 S. Ct. at 2780 (citation omitted). Thus, although the court's analysis of a RLUIPA claim is similar to that of a First Amendment Free Exercise claim, RLUIPA violations require strict scrutiny; this standard is less deferential than the "reasonableness" test applied to prison policies in Free Exercise Claims. Compare Lovelace, 472 F.3d at 198–99, 199 n.8 ("RLUIPA adopts a 'more searching standard' of review than that used for parallel First Amendment claims, strict scrutiny instead of reasonableness." (quoting Madison v. Riter, 355 F.3d 310, 314–15 n.1 (4th Cir. 2003))), with O'Lone, 482 U.S. at 349 ("[P]rison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.").

## Analysis

The court first considers Kelliher's likelihood of success on the merits. See Winter, 555 U.S. at 20. Two distinct lines of analysis are required to determine if NCDPS policies violate either (1) the First Amendment's Free Exercise Clause; or (2) RLUIPA.[1] See, e.g., Holt, 135 S. Ct. at 862

---

[1] The court notes that Kelliher's amended complaint also alleges that similarly situated Catholic and Protestant inmates at Nash receive differing access to Holy Communion. See Am. Compl. [D.E. 19] at ¶45. The court infers that Kelliher may be attempting to assert a claim under the Equal Protection clause of the Fourteenth Amendment. In order to succeed on an Equal Protection claim, "a plaintiff must first demonstrate that he has been treated differently from

11

(outlining the differing analyses required for claimed Free Exercise Clause and RLUIPA violations).

As to his Free Exercise claim, Kelliher has made a strong showing that his religious beliefs are sincere, see Wall, 741 F.3d at 499, and that the NCDPS policies at issue–denying weekly pastoral visits, the provision of a hymnal and sermon pamphlets at visits, and the consumption of sacramental wine during the Lord's Supper–violate his beliefs and require him to modify his behavior, thus substantially burdening his religious exercise, see Lovelace, 472 F.3d at 187. Nevertheless, as the court noted in its order denying Kelliher's earlier request for preliminary injunctive relief, it remains unclear whether these burdens are related to proper penal interests. See Order [D.E. 18] at 4 (citing Turner, 482 U.S. at 89 ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.")).

Here, defendants assert that they will articulate "their justifications or rationale for the questioned restrictions in the form of [forthcoming] discovery proceedings and dispositive motions." Defs.' Resp. [D.E. 35] at 7. Thus, in spite of Kelliher's *prima facie* showing that NCDPS policies are a substantial burden on his religious exercise, because defendants still may demonstrate that these restrictions relate to proper penal interests, his likelihood of success on the merits for a Free Exercise claim presently is uncertain. Preliminary injunctive relief, therefore, is unavailable on these grounds. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (noting that, when a court considers an inmate's claim pursuant to the First Amendment's Free Exercise Clause, "[t]he burden . . . is not on the State

---

others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). To the extent that Kelliher actually raises a Fourteenth Amendment Equal Protection claim, this claim presently is speculative, only modestly developed, and not admitted by defendants. See Defs.' Answer [D.E. 30] at ¶ 45. Accordingly, Kelliher has not shown a likelihood of success on the merits as to an Equal Protection claim. See Winter, 555 U.S. at 20.

12

to prove the validity of prison regulations but on the prisoner to disprove it."); see also Taylor v. Freeman, 34 F.3d 266, 269 (4th Cir. 1994) ("Even where there has been a finding on the merits that unconstitutional conditions exist, federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators.").

By contrast, the court finds that Kelliher's RLUIPA claim has a strong chance of success on the merits. See Winter, 555 U.S. at 20. As noted above, Kelliher has made a *prima facie* showing that NCDPS policies are a substantial burden on his religious exercise. See Lovelace, 472 F.3d at 187. Moreover, the protections afforded by RLUIPA are both broader than those of the Free Exercise Clause and unaffected by whether or not there is a proper penal interest buttressing the policies in question. Compare Holt, 135 S. Ct. at 859–60, with Turner, 482 U.S. at 89.

Although defendants argue that NCDPS regulations restricting Kelliher's religious practice are not "per se Constitutional violation[s] because '[t]he State does not have an affirmative duty to provide every prison inmate with . . . the [religious] service of his choice,'" Defs.' Resp. [D.E. 35] at 4 (quoting Small v. Lehman, 98 F.3d 762, 767 (3d Cir. 1996)), this argument misses the mark. NCDPS does indeed allow Kelliher other religious outlets (corporate services, prayer, quarterly Holy Communion services, etc.), but such allowances do not preclude a finding that his religious exercise is burdened substantially under RLUIPA. See Holt, 135 S. Ct. at 862 ("RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise.").

Even presuming, without deciding, that there is a "compelling governmental interest" in the present NCDPS policies, defendants have not demonstrated that the burden on Kelliher's exercise is the "least restrictive means" of furthering this interest. Indeed, neither party disputes that, while

13

incarcerated, Kelliher has already received the measure of relief that he seeks. Regardless whether these pastoral visits occurred one time in contravention of NCDPS policies, see Defs.' Answer [D.E. 30] at ¶¶ 24, 25, or on a weekly basis from January 2010 until May 2016, see Am. Compl. [D.E. 19] at ¶ 21, the fact that such a visit occurred demonstrates that Kelliher's requested accommodation is possible and indicates that an outright ban on Kelliher's requested accommodation is not the "least restrictive means" of furthering a "compelling governmental interest." Cf. 42 U.S.C. § 2000cc-1.

The second Winter factor asks whether Kelliher would likely suffer irreparable harm without the requested injunctive relief. See Winter, 555 U.S. at 22. Kelliher avers that the NCDPS policies at issue "amount[] to a prevention of the practice of [his] religion and . . . receiving forgiveness of sins–imperiling [his] soul." Kelliher Decl. [D.E. 34] at ¶ 35. Defendants do not contest the sincerity of Kelliher's declaration, c.f. Wall, 741 F.3d at 499, and the Court may not question the doctrinal merits of his argument, see Jehovah v. Clarke, 798 F.3d 169, 174 (4th Cir. 2015) ("[I]t is not within the courts' purview to 'question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" (quoting Hernandez v. Comm'r of Internal Revenue, 490 U.S. 680, 699 (1989))). Succinctly stated, this factor weighs in Kelliher's favor because the court is persuaded by findings in other jurisdictions that a *prima facie* showing of a RLUIPA violation itself satisfies the injury requirement for preliminary injunctive relief. See Opulent Life Church v. City of Holly Springs, Miss., 697 F.3d 279, 295 (5th Cir. 2012); Reaching Hearts Int'l, Inc. v. Prince George's Cnty., 584 F.Supp.2d 766, 795 (D. Md. 2008).

The third Winter inquiry asks the court to weigh the equities. See Winter, 555 U.S. at 20. As Winter parenthetically noted, "[t]he policy against the imposition of judicial restraints prior to an adjudication of the merits becomes more significant when there is reason to believe that the

14

decree will be burdensome." Id. at 27 (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 167–68 (2d ed.1995)).

Here, the state is not being asked to provide expensive, difficult, unusual, or complex religious services to Kelliher. Rather, the state merely is being asked to allow a willing visiting pastor to resume providing individual ministry and the "Sacrament of the Alter," thus removing a presently substantial burden on Kelliher's religious practice. The narrow scope of this intrusion indicates that there little merit to NCDPS's concern regarding the burden on prison management should the requested relief be granted. See Holt, 135 S. Ct. at 860 (noting that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."); id. at 867 (Ginsburg, J., concurring) (noting that "accommodating petitioner's religious belief in this case [a request to grow a half-inch beard] would not detrimentally affect others who do not share petitioner's belief"). In light of the evidence presented, the court finds that the equities weigh in Kelliher's favor. See, e.g., Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) (noting that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." (internal quotation marks omitted)).

As to whether an injunction is in the public interest, Winter, 555 U.S. at 20, Kelliher avers that weekly observance of the "Sacrament of the Alter"–to include partaking in sacramental wine during the Lord's Supper–is an integral part of his Missouri-Synod Lutheran religious exercise, see Am. Compl. [D.E. 19] at ¶ 22; Kelliher Decl. [D.E. 34] at ¶¶ 3, 4. As noted above, RLUIPA provides expansive religious protection and requires that its provisions "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter

15

and the Constitution." 42 U.S.C. § 2000cc–3(g).

Although defendants argue that requiring the "NCDPS to accept items which it has prohibited or deemed contraband would certainly implicate security and safety concerns," see Defs.' Resp. [D.E. 35] at 8, the court gives little weight this vaguely articulated and thinly supported concern, see Couch, 679 F.3d at 201 (noting that, although courts take into account issues of prison safety, security, and discipline, a court need only afford deference to government explanations that sufficiently articulates why the disputed policy advances a compelling governmental interest). The filings do not suggest that Pastor Rappe brought dangerous contraband into prison during his prior visits or that his visitor privileges have ever been suspended or revoked. Likewise, the record does not support a presumption that the re-establishment of Pastor Rappe's weekly visits–including the provision of a Lutheran Hymnal, a Sunday Sermon pamphlet, a wafer, and sacramental wine–would pose a safety risk to the prison populace or the general public. See, e.g., Jehovah, 798 F.3d at 178 ("Furthermore, a jury could find that the prison population would not be endangered by a single inmate with no history of alcohol abuse consuming a small amount of wine in this setting."). The court concludes that, because defendants have not sufficiently articulated any risk to the public, and because Kelliher's religious exercise rights under RLUIPA overlap and exceed his constitutional rights under the Free Exercise Clause, preliminary injunctive relief upholding Kelliher's RLUIPA rights serves the public interest. See Holt, 135 S. Ct. at 864 ("Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise. But that respect does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard."); Carandola, 303 F.3d at 521 (noting that "upholding constitutional rights surely serves the public interest").

16

Case 5:16-ct-03250-BO   Document 49   Filed 04/02/18   Page 16 of 20

In sum, the court finds that, as to Kelliher's RLUIPA claim, each Winter factor weighs in his favor. Moreover, the requested preliminary injunctive relief is "narrowly drawn, extend[s] no further than necessary to correct the harm . . . and [is] the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The court has weighed the potential "adverse impact on public safety" and concludes that, on the balance, the requested injunctive relief is in the public interest and the equities otherwise favor Kelliher. See id.; Winter, 555 U.S. at 20. For these reasons, the court grants the requested injunctive relief for the maximum 90-day term. 18 U.S.C. § 3626(a)(2).

Having decided that a preliminary injunction is appropriate here, the Federal Rules of Civil Procedure require that the "movant give[] security" upon receipt of a preliminary injunctive relief. Fed. R. Civ. P. 65(c). However, "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." Pashby v. Delia, 709 F.3d 307, 332 (4th Cir. 2013) (citing Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999); Moltan Co. v. Eagle–Picher Indus., Inc., 55 F.3d 1171, 1176 (6th Cir. 1995)). Here, because defendant is incarcerated and the court infers that little actual cost will be required for the defendants to enact the requested injunctive relief, the court deems that the security requirement shall be waived. See International Controls Corp. v. Vesco, 490 F.2d 1334 (2d Cir.1974) (approving district court's fixing bond amount at zero in the absence of evidence regarding likelihood of harm).

The Federal Rules of Civil Procedure also require the court to "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). The court satisfies this requirement in the conclusion section below.

The court concludes with a general consideration of the NCDPS policy banning inmates from consuming sacramental wine. As noted above, Kelliher asserts that receiving the Lord's Supper with

17

sacramental wine is central to his exercise of Missouri-Synod Lutheranism. See Kelliher Decl. [D.E. 34] ¶¶ 3, 4. Various other faith practices also consume sacramental wine in religious ceremony. See, e.g., Cutter, 544 U.S. at 721 ("'The exercise of religion' often involves not only belief and profession but the performance of . . . physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine." (quoting Smith, 494 U.S. at 877)); Jehovah, 798 F.3d at 173, 179 (detailing a plaintiff's religious practice requiring "that he take communion by drinking red wine and consuming bread dipped in honey, olive oil, sugar, cinnamon, and water" and reversing the district court's granting of summary judgment against plaintiff's "wine communion" claim under the First Amendment); Haight, 763 F.3d at 566 ("RLUIPA thus does not permit a prison warden to deny a Catholic inmate access to wine for a communion service on the ground that grape juice is a reasonable substitute or to deny grape juice to a Presbyterian inmate on the ground that water is a reasonable substitute."); Levitan v. Ashcroft, 281 F.3d 1313, 1322 (D.C. Cir. 2002) (remanding to the district court for fact-finding to determine whether a U.S. Bureau of Prisons ("BOP") program statement that precluded Catholic inmates from consuming sacramental wine during Holy Communion satisfied the four factors outlined in Turner and O'Lone); Sample v. Lappin, 424 F. Supp. 2d 187, 193 (D.D.C. 2006) (finding that a Jewish inmate challenging BOP regulations that precluded him from consuming one cup of wine during Friday and Saturday Shabbat services, and four cups of wine during the Passover Seder had made out a *prima facie* case under the Religious Freedom Restoration Act, a predecessor to RLUIPA); see also Whitney v. Brown, 882 F.2d 1068, 1069 (6th Cir. 1989) (discussing the importance of the Passover Seder to the Jewish religion and affirming a district court's decision to overturn as an impermissible infringement on inmates' free exercise rights a state prison policy that eliminated annual Passover Seders). Indeed,

even during Prohibition, the right to consume sacramental wine with Holy Communion was never in doubt. See [D.E. 33] at 20 n.5 (quoting Smith, 494 U.S. at 913 n.6 (Blackmun, J. dissenting)).

To the extent defendants argue that an outright ban on sacramental wine does not violate the Free Exercise Clause or RLUIPA because the policy is neutral and applies equally to all prisoners, they are incorrect. As the Supreme Court has noted, "'[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion.'" Thomas, 450 U.S. at 717 (quoting Wisconsin v. Yoder, 406 U.S. 205, 220 (1972)); see also Smith v. Ozmint, 578 F.3d 246, 252 (4th Cir. 2009) (noting that neutral burdening of religious exercise may violate RLUIPA). Moreover, the Fourth Circuit found that, although a prison system's outright ban on inmate sacramental wine consumption may constitute a compelling government interest and be logically connected to "preventing alcohol misuse and abuse," it remained unclear whether this ban could survive the Turner test. See Jehovah, 798 F.3d at 178–79. Succinctly stated, the court finds the same concerns present in this case.

Under current NCDPS policy, sacramental wine presently either is brought into, or stored at, North Carolina prisons. See Chapter H, § .0106(i), "Religious Services," State of North Carolina Department of Public Safety Prisons, Policy & Procedure (noting, among other things, that the "Chaplaincy Services Director" may approve the use of sacramental wine in religious services for "some faith groups" on a case-by-case basis where the "religious official leading the rite may consume alcohol"); see also Defs.' Resp. [D.E. 35] at 4 (noting that Nash holds quarterly Holy Communion services). Moreover, prisons regularly control other "contraband" within their walls, including medication meted out by staff. See Jehovah, 798 F.3d at 178–79. As the plaintiff-appellant proposed in Jehovah, security measures for storing and dispensing medicine might also be

applied to the storing and provision of sacramental wine. See id. Accordingly, the court directs defendants to propose a method of making sacramental wine available for individual inmate consumption during religious services while still maintaining necessary safety protocols.

## Conclusion

For the reasons discussed above, the court:

(1)  GRANTS Kelliher's motion seeking preliminary injunctive relief [D.E. 32] for the maximum 90-day term. See 18 U.S.C. § 3626(a)(2);

(2)  WAIVES the bond requirement for Kelliher. See Fed. R. Civ. Pro. 65(c);

(3)  DIRECTS defendants, by and through NCDPS, to permit Pastor Rappe to resume: (a) weekly pastoral visits with Kelliher; (b) administering the Lord's Supper to Kelliher using a wafer and less than one ounce of consecrated wine; and (c) bringing the Lutheran Hymnal and Sunday Sermon pamphlet to these visitations, provided that all of these outside items be subject to security searches. See Fed. R. Civ. Pro. 65(d);

(4)  DIRECTS defendants, by and through NCDPS, to come into compliance with this preliminary injunction not later than two weeks from the date of this order; and

(5)  DIRECTS defendants, by and through NCDPS, not later than 120 days from the date of this order, to propose to the court a secure method for permitting inmates to individually partake in the controlled consumption of sacramental wine during religious services in NCDPS prison facilities.

SO ORDERED, this the ___ day of April, 2018.

TERRENCE W. BOYLE
United States District Judge

20

Case 5:16-ct-03250-BO   Document 49   Filed 04/02/18   Page 20 of 20