THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:16-CT-03250-BO

| | | |
|---|---|---|
| JAMES R. KELLIHER, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF LAW IN** |
| | ) | **SUPPORT OF DEFENDANTS'** |
| v. | ) | **MOTION TO RECONSIDER THE** |
| | ) | **COURT'S RULING GRANTING** |
| JOHNNY HAWKINS, *et. al.*, | ) | **PLAINTIFF'S MOTION FOR A** |
| | ) | **PRELIMINARY INJUNCTION** |
| Defendants. | ) | |

**NOW COME** Defendants Johnny Hawkins, Kenneth Lassiter, Erik A. Hooks, and Betty

Brown (hereinafter "Defendants"), by and through counsel, North Carolina Attorney General

Joshua H. Stein and Assistant Attorney General Yvonne B. Ricci and submit this Memorandum

of Law in support of their Motion to Reconsider.

## <u>INTRODUCTION</u>

NCDPS is responsible for the safety and security of approximately 36,685 offenders in its

custody. (Brown Aff. ¶ 26)  In addition, NCDPS prioritizes the religious accommodations of the

inmates in its custody, 19,341 of whom self-identify as Christians. (*Id.* ¶ 27, Ex. E, p. 1 of 7)

As part of these accommodations, for example, Nash Correctional Institution ("Nash")[1],

allows for individual pastoral visits to occur on any day and time as Nash's regularly-scheduled

visitation.  Nash also provides a monthly Mass for Catholics and quarterly Communion for

Protestants. (Hamlin Aff. ¶¶ 6-10, Ex. B)  To enable these pastoral visits, each visitor (including

any ritual items he or she intends to bring into the facility) must be searched, visitations must be

private but supervised, and the inmates and visitors must be searched at the end of the visit.  This

---

[1] Plaintiff Kelliher is currently confined at Nash. *See* Exhibit A attached to Betty Brown's Affidavit.

takes dozens of hours of correctional officer time. (*Id.* ¶¶ 7-8, 15)

In addition, NCDPS prison policy allows an approved chaplain or religious volunteer, supervised by a chaplain, designated staff member or custody, to deliver the Sacrament and Communion, and the priest or minister leading the religious service may consume the sacramental wine during the service. (Brown Aff. ¶ 19) Requiring religious leaders to consume the sacramental wine themselves sustains NCDPS's policy of not permitting inmates to consume alcohol while respecting the place and purpose or sacramental wine in religious ceremonies. (*Id.* ¶¶ 22-23)

The April 2, 2018 Order ("the Order") [D.E. 49] entered by this Court asks NCDPS to jeopardize its obligations to the safety, security, and rehabilitation of its inmates by allowing the inmates to consume alcohol. (Joyner Aff. ¶¶ 4, 6-7) In addition, the Order requires that NCDPS add hours of correctional officer time and labor to the work week to accommodate weekly pastoral visits. Further, the Order presents significant logistical and administrative burdens, which include establishing new policies and procedures, hiring additional custody staff, and training the new and existing custody staff. Compounding the issue, these actions are not supported by NCDPS' current funding and because the North Carolina General Assembly has made no appropriation for these purposes, NCDPS would be forced to divert money from previously budgeted priorities to accommodate these new religious services accommodations. (Joyner Aff. ¶¶ 12-18) Thus the accommodations are extremely burdensome and exceed the requirements of the Religious Land Use and Institutionalized Persons Act ("RLUIPA")[2] which, while generally preventing prisons from imposing a substantial burden on the religious exercise of an inmate, allows prisons to deny requests for religious accommodations when they are able to demonstrate that the burden imposed

_____

[2] This Court concluded that preliminary injunctive relief was unavailable as to Plaintiff's First Amendment Free Exercise Clause claim; therefore, this motion is made only in relation to Plaintiff's RLUIPA claim.

on the inmate is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

When a religious accommodation requested under RLUIPA jeopardizes the functioning of the prison, as Plaintiff's requested accommodations for weekly visits with his Pastor and to consume sacramental wine do, the prison facility may properly deny it without running afoul of RLUIPA's requirements. *See generally, Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005). Therefore, Defendants respectfully request that the Court modify its order for preliminary injunction and allow NCDPS to continue to maintain its practices.

## BACKGROUND

### A.    NCDPS's Alcohol Policy

NCDPS has a policy prohibiting the consumption of alcohol by inmates that has existed since at least 1994. This policy aims (1) to eliminate exposing inmates to contraband and (2) to eliminate factors that might detract from NCDPS's rehabilitative goals for its inmate population. (Joyner Aff. ¶¶ 6-7)  By doing so, the policy achieves the important governmental interest of ensuring the safety of the inmates entrusted to NCDPS custody and maintaining the safety of the prison for the inmates and the NCDPS staff that run it. Approximately 70% of the inmates in NCDPS custody have experienced some form of substance abuse. (Joyner Aff. ¶ 6)  Through the diagnostic process undertaken at the outset of incarceration, NCDPS administers a screening tool to determine each offender's need for treatment services. Data available for the 2016-2017 fiscal year shows that 71% (12,267) of the offenders were at risk of alcohol or chemical dependency, slightly higher than the typical data – between 60% and 70% of admitted offenders – for previous years. (Rivenbark Aff. ¶ 5)

3

The aim of NCDPS's rehabilitative approach for treatment of substance use disorders is to create the environment necessary for inmates to establish substance-free lifestyles, both during their incarceration and after their release from confinement. A fundamental feature of the design of NCDPS's general substance abuse program is that participants will completely abstain from consuming mood-altering substances, including alcohol. (*Id.* ¶ 6) While religiously-sanctioned alcohol consumption may not present a risk to all inmates, for some inmates with a history of dependency, even the smallest amount of a mood-altering substance such as alcohol may trigger a relapse cycle. Moreover, simply being in the presence of alcohol may act as a "behavioral trigger" and put some inmates at risk of relapse. (*Id.* ¶ 7) In the view of NCDPS's Deputy Director of Prisons Carlton Joyner, based on his thirty-four years of experience working with inmate populations, introducing the consumption of alcohol in the prison context presents real and significant risks to the security and safety of the inmates and NCDPS staff, and mitigating this risk does not appear feasible based on a review of available resources and protocols. (Joyner Aff.¶ 6)

While NCDPS maintains a strong interest in ensuring the safety and security of inmates by banning the consumption of alcohol, it balances that interest, where possible, to accommodate inmates' religious practices. As a result, NCDPS recognizes and accommodates several denominations of the Christian faith that might ordinarily include sacramental wine as a component of a corporate religious service.

For example, at Nash, Roman Catholic Mass is held monthly, for which a volunteer priest is permitted to bring a limited amount of sacramental wine, wafers, and other ritual items into the facility, but is not permitted to share the wine with the inmates and may only consume it himself. (Hamlin Aff. ¶ 9, Ex. B; Brown Aff. ¶¶ 18-22, Ex. D and E) Also, Protestants are permitted to

4

take Communion ("Lord's Supper") at Nash on a quarterly basis, and inmates are served wafers that come in sealed packages from preapproved vendors, and juice contained in small sealed packages which are purchased by the facility and opened at the time of service.  (*Id.* ¶ 10, Ex. B; Brown Aff. ¶¶ 18-22, Ex. D and E)

## B.     NCDPS's Visitation Policy

The NCDPS visitation policy provides that when a clergy or pastoral visit is scheduled, the facility should allow the visit to be conducted in a private setting if possible and that clergy visits should not be counted as the standard one visit per week by regular visitors[3] that inmates are otherwise allowed.  (Hamlin Aff. ¶ 6, Ex. A at Section .0203(b)).  Visitation for the standard one visit per week by regular visitors to inmates at Nash is held on Tuesday, Thursday – 8:30 am – 10:30 am; Wednesday/Friday – 8:30 am – 10:30 am, 12:30 pm – 2:30 pm; and on Saturdays – 8:00 am – 9:30 am, 10:30 am – 12:00 pm, 1:00 pm – 2:30 pm.  Nash's visitation officer schedules visitation for members of the clergy.  (*Id.* ¶ 7)  Clergy visits can occur on any day and time that regular visits are conducted.  Clergy visits are held in the same visitation area where regular visits are conducted.  When the prison allows clergy to bring in ritual items for these visits, the ritual items are enclosed in a case that is searched by custody staff before the priest enters the facility and searched again when the priest exits the facility.  (*Id.* ¶ 8)  Before every visit, custody staff must search all visitors at the gatehouse.  Once visitation begins, correctional officers must observe inmates and visitors at all times during the visit.  (*Id.* ¶ 7)  These measures are fundamental to maintaining the prison's security and the safety of the prison's inmates.

Nash employs as many as 166 correctional officers, each of whom can be assigned to work

---

[3] As defined in Exhibit A at Section .0203(a) attached to John Hamlin's Affidavit.

at the gatehouse where visitors are screened. If Pastor Rappe is allowed to continue to make weekly pastoral visits and to bring with him sacramental wine and wafers for weekly Communion with Plaintiff, the safety and security of Nash will be negatively affected. At the expense of already limited time and resources, for procedural consistency, each custody employee will need to be informed and trained on special procedures for a pastor's weekly visits to ensure he is not denied access to the facility and to ensure he is permitted to bring in items that no other visitor is allowed to bring in. (Hamlin Aff. ¶ 12) In addition, the implementation of special accommodations for Plaintiff increases the likelihood that staff will accidently allow other contraband items to enter the facility during others' visits.

In order to accommodate the privacy of any religious worship or other religious activities during the pastoral visit and to reduce any potential conflict and confusion, the spiritual advisor will need to report to the facility at least forty-five (45) minutes before the normal visitation reporting time to be processed and searched. This would allow the advisor approximately thirty (30) minutes to conduct the Lord's Supper or other aspects of a pastoral visit in the visitation area, before other visitors or inmates are allowed to enter. Visitors and inmates who have to wait to accommodate an inmate's clergy visits are likely to complain about disruptions – perceived or real – in the routine visitation process; these complaints will require attention from correctional officers. The privacy required for a pastor or spiritual advisor to conduct the Lord's Supper or a pastoral visit will also require that correctional officers be posted in the visitation area earlier, necessarily taking them away from their regular posts and preventing their utilization elsewhere in the facility. (Hamlin Aff. ¶ 14) When Pastor Rappe's visit is over, the Plaintiff will be required to leave thirty minutes earlier than the rest of the group because his visitation started earlier. One

6

of the correctional officers assigned to monitor visitation will have to leave his post in the visitation area to search the offender prior to his return to his housing unit. This poses a security threat because fewer correctional officers will be left to monitor the other inmates and visitors, thereby increasing the possibility of contraband being introduced into the facility and the possibility that unmonitored inmates and visitors will engage in unauthorized or inappropriate behavior given the more limited supervision. (*Id.* ¶ 15)

### C.     Kelliher's Motion for Preliminary Injunction and This Court's Order

On December 14, 2017, Plaintiff filed a motion for preliminary injunction seeking an order compelling NCDPS and the Defendants to permit him to: (1) partake in sacramental wine at the Lord's Supper, (2) meet with his pastor on a weekly basis, and (3) consult the Lutheran Hymnal and Sunday Sermon pamphlet. [D.E. 32] On February 1, 2018, this Court conducted a hearing on Plaintiff's motion for a preliminary injunction. On April 2, 2018, this Court entered the Order providing Plaintiff his sought-after relief. [D.E. 49, p 20] In addition, *sua sponte*, this Court ordered Defendants "to propose to the court a secure method for permitting inmates to individually partake in the controlled consumption of sacramental wine during religious services in NCDPS prison facilities." [D.E. 49, p. 20]

### ARGUMENT

### A. The Legal Standard for a Motion for Reconsideration

District courts have authority under both common law and Rule 54(b) of the Federal Rules of Civil Procedure to reconsider an interlocutory order and to reopen any part of a case before final judgment. *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 512-513 (4th Cir. 2003) (indicating interlocutory orders are subject to reconsideration at any time prior to the entry of a

final judgment); *Fayetteville v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469-70 (4th Cir.1991) (approving of Rule 54(b) as a proper procedural vehicle for bringing motions to reconsider interlocutory orders). Moreover, a district court "clearly [has] both statutory and equitable authority to modify" an order granting a preliminary injunction. *Transportation, Inc. v. Mayflower Services, Inc.*, 769 F.2d 952, 954 (4th Cir. 1985). In *American Canoe*, the Fourth Circuit recognized three grounds upon which motions for reconsideration have been granted: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice. *Am. Canoe Ass'n*, 326 F.3d at 515.

Moreover, if a motion for reconsideration is brought within twenty-eight (28) days of the original order, a district court is also authorized under Rule 59(e) of the Federal Rules of Civil Procedure to reconsider and thus modify an existing preliminary injunction. *In re Burnley*, 988 F.2d 1 (4th Cir. 1992). Rule 59(e) may be used (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice. *Ingle v. Yelton*, 439 F.3d 191, 197 (4th Cir. 2006); *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993).

**I.      The Order that Defendants propose to the Court a secure method for permitting inmates to individually partake in the controlled consumption of sacramental wine during religious services in NCDPS prison facilities exceeds the individualized relief sought by the Plaintiff and the authority of the Court, presents a clear error of law, and creates "manifest injustice" in its imposition of an unmanageable burden on Defendants.**

In Plaintiff's Motion for Preliminary Injunction, he requested this Court to enter a preliminary injunction ordering Defendants to refrain from prohibiting **him** from (1) partaking in sacramental wine at the Lord's Supper, (2) meeting with his pastor on a weekly basis, and (3)

8

consulting the Lutheran Hymnal and Sunday Sermon pamphlet, pending adjudication of the matter on the merits. [D.E. 32] Nowhere, however, does Plaintiff seek system-wide relief on behalf of all inmates, nor does he seek certification of a purported class of similarly-situated inmates who might be entitled to such a broad remedy. [D.E. 32] Accordingly, the Court's contemplation of future, system-wide procedures for serving sacramental wine to all inmates in NCDPS custody appears improper and merits reconsideration. *See Virginia Chapter, Associated General Contractors v. Kreps, 444 F. Supp. 1167 (W.D. Va. 1978)* (A district court judge's discretion in granting or denying preliminary injunctive relief is not boundless and an appellate court will overturn a district court's decision if made under an improper legal standard.)

The Prison Litigation Reform Act ("PLRA") limits the relief that a court may grant regarding prison conditions. *See* 18 U.S.C. § 3626; *see also Wilkinson v. Austin*, 545 U.S. 209, 230 (2005) (noting that any prospective relief granted to prisoners contesting a state prison policy "must comply with the conditions set forth in 18 U.S.C. § 3626(a)(l)(A)"). Section 3626(a) of the PLRA states, in relevant part:

> (a)(l)(A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief . . . .

> (a)(2) . . . **Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.** The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (l)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the

9

date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(l) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C. § 3626(a)(l)(A), (a)(2) (emphasis added).

Given the narrow scope of injunctive relief available under Section 3626(a)(2) of the PLRA, and based on the limited record before the Court prior to its April 2, 2018 Order, this case does not call for the extraordinary relief granted. Where, as here, "substantial issues of constitutional dimensions" are before the Court, those issues should be fully developed at the summary judgment stage and/or trial in order "to [e]nsure a proper and just resolution." *Wetzel v. Edwards*, 635 F.2d 283, 291 (4th Cir. 1980); *see also Price v. City of Fayetteville*, No. 5:13-CV-150-FL, 2013 U.S. Dist. LEXIS 58587, 2013 WL 1751391, at *4 (E.D.N.C. Apr. 23, 2013) ("'On an application for preliminary injunction, the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact,' and '[a]s a prerequisite to the issuance of an interlocutory injunction, . . . [t]here must be no disputed issues of fact.'" (alterations in original) (quoting *Gantt v. Clemson Agric. Coll. of S.C.*, 208 F. Supp. 416, 418-19 (D.S.C. 1962))). Requiring Defendants and, by extension, NCDPS to devise a system-wide process for furnishing sacramental wine to inmates as part of religious worship vastly exceeds the limits of the PLRA and constitutes an abuse of discretion. Moreover, Plaintiff's lone claim under RLUIPA does not contemplate class-type relief, but instead concerns the religious exercise of **a person** and not a group or institution. 42 U.S.C. § 2000cc-1(a); *Allah v. Virginia*, 601 Fed. Appx. 201 (4th Cir. 2015) (noting that 42 U.S.C. § 2000cc-1(a) concerns the religious beliefs of the individual inmate). Therefore, this Court exceeded the scope of its discretion pursuant to the PLRA and RLUIPA, and the directive that Defendants propose a method to allow "inmates to individually partake in the

controlled consumption of sacramental wine during religious services"

In addition to being unsupported by law in terms of its scope, the April 2, 2018 Order's expansive directive to create a plan for all inmates works a manifest injustice on Defendants. NCDPS has approximately 36,685 offenders in its custody; any decision made for just one offender will have a potential impact on NCDPS's responsibility to maintain custody, supervision, and rehabilitation of the other 36,684. (Brown Aff. ¶ 26) NCDPS has 19,341 inmates who have self-identified as either Catholic or Protestant Christians. (Brown Aff. ¶ 27) Accordingly, should each of the State's inmates who have designated the Christian faith as their religious preference request access to sacramental wine as a religious worship requirement, the complications of providing that wine to that quantity of inmates is expected to be daunting. (*Id.* ¶ 28)

The provision of alcohol to any inmate arguably creates grounds for other inmates to claim that NCDPS must provide sacramental wine and weekly services if they have beliefs similar to Plaintiff's. (Joyner Aff. ¶ 5; Brown Aff. ¶ 28) Should each of the State's inmates who have designated the Christian faith as their religious preference request weekly visits in the manner that the court has proscribed for the Plaintiff, NCDPS would not be able to function. These visits must be both preceded and concluded by individual searches, conducted by custody staff of each visitor and inmate; that process is time-consuming and diverts correctional staff's ability to respond in emergency situations elsewhere in a facility. In order to accommodate such a requirement on a system-wide level, NCDPS would have to extend visiting hours at each of its fifty-five (55) facilities and increase staffing levels to a point that is not possible to achieve. This is especially true in the face of NCDPS's current staffing shortage. (Joyner Aff. ¶¶ 17, 18)

In addition, the NCDPS policy – in place since at least 1994 – prohibiting any consumption

of alcohol by inmates was established to eliminate the possibility of exposing members of the inmate population to contraband. (*Id.* ¶ 6) The outright prohibition of the consumption of alcohol by inmates in the State's custody is also consistent with NCDPS's rehabilitative goals for its inmate population. Implementing the Court's order across every NCDPS facility would be contrary to these goals, as many of the inmates in the State's custody have a history of drug abuse or alcohol dependency. (*Id.* ¶ 7)

When coupled with other rehabilitative programming, eliminating inmate access to alcohol is vital to preventing the inmate population from relapsing into alcohol addiction or further partaking in unhealthy behavior. (*Id.*) Approximately 70% of the inmates in NCDPS custody have experienced some form of substance abuse. (*Id.* ¶ 6) Offenders entering prison, while in the diagnostic process, are administered a screening tool to determine their need for treatment services. Fiscal Year 2016/2017 data shows that 71% (12,267) of the offenders were at risk. The number typically trends between 60% and 70% of intake offenders each year. (Rivenbark Aff. ¶ 5)

While religiously sanctioned substance consumption may not be considered a relapse event, in some cases of dependency, even the smallest amount of a mood-altering substance, such as alcohol, may trigger a relapse cycle. A triggering event could include the consumption of even a small amount of sacramental wine during a properly authorized religious ceremony. Moreover, simply being in the presence of alcohol may act as a "behavioral trigger" and put some inmates at risk of relapse. (*Id.* ¶ 7) If NCDPS changes its policies to allow inmates to consume sacramental wine during religious ceremonies, it is likely that some inmates in the substance use disorder treatment program may also seek to participate in these religious ceremonies. In so doing, these inmates' presence where alcohol is being used or their consumption of even a small amount of

12

alcohol during religious ceremonies may put them at risk of relapse. (*Id.* ¶ 8)

As the system-wide injunctive relief ordered – or at least contemplated – by the Court is contrary to law, is beyond the Court's discretion to award, is far greater than the relief Plaintiff requested, and would impose manifest injustice on NCDPS, Defendants respectfully submit that reconsideration and modification of the April 2, 2018 Order is warranted. The directives relating to system-wide relief contained in that Order should be vacated.

## II.    The injunctive relief granted specifically to Plaintiff is unwarranted because Plaintiff's case is not likely to succeed on the merits and the Order creates an impractical burden on Defendants.

In its order granting the motion for preliminary injunction, this Court found that Plaintiff had made a *prima facie* showing under RILUPA that NCDPS policies were a substantial burden on his religious exercise and that Defendants had not demonstrated that the burden on that exercise was the "least restrictive means" of furthering a "compelling governmental interest." In light of Defendants' evidence in the attached supporting affidavits and exhibits, the relief provided specifically to Plaintiff should be vacated because not only is the Plaintiff unlikely to succeed on the merits, but also the burdens the Order imposes on the Defendants are significant enough that the balance of equities weigh against the ordered injunctive relief.

Parties seeking preliminary injunctions are required to demonstrate that "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013); *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

Defendants can show that NCDPS's policy preventing inmate consumption of alcohol (including sacramental wine) serves a compelling governmental interest and the burden it imposes

on Plaintiff's exercise of religion is the least restrictive means of furthering the compelling governmental interest. *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009). In analyzing the government's compelling interest, the court should give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (quotation omitted). If a religious request jeopardizes the function of the prison, the prison may deny the request. *Id.* at 726.

A. *Plaintiff did not show a likelihood of success on the merits*

Defendants do not question Plaintiff's beliefs. Unfortunately, his request for weekly visits and consumption of sacramental wine jeopardizes the safety and security of the Nash facility. Therefore, his request should be denied.

This Court's order requiring that Defendants permit Plaintiff to consume a small amount of sacramental wine presents a number of serious and specific safety and security concerns. (Joyner Aff. ¶ 4) NCDPS policy prohibits the consumption of alcohol among its inmate population, including during any religious services. (Brown Aff. ¶¶ 19-22, Ex. D and E) The enforcement of this policy serves a compelling governmental interest – specifically, the policy is critical to NCDPS being able to maintain the safety and security of the inmates in its custody, as well as the safety and security of NCDPS staff and the public.

NCDPS's policy prohibiting the consumption of alcohol by inmates is tailored to achieve two compelling governmental objectives: (1) to avoid exposing inmates to contraband and (2) to eliminate factors that might detract from NCDPS's rehabilitative goals for its inmate population. (Joyner Aff. ¶¶ 6-7) These interests are core to NCDPS's mandate to maintain the security and

14

safety of its inmate population. Religiously-sanctioned alcohol consumption risks the safety and security of individual inmates because it has relapse and trigger potential for inmates with current or past dependency issues and because the practice of allowing inmates to consume sacramental wine carries with it the same risk that allowing inmates to consume contraband alcohol does. (Joyner Aff. ¶ 12)

As part of its duty to ensure the safety and security of those within its custody, NCDPS prohibits inmates from consuming any food or drink that is not made at the facility or delivered to the facility by an approved vendor. This limitation applies to items that are consumed as part of religious services in which inmates participate. NCDPS does not have the infrastructure, expertise, or resources necessary to confirm that sacramental wine is not tainted or contaminated prior to the wine being consumed by the Plaintiff inmate. Similar prohibitions are in place for regular visitors attempting to bring in outside food and drink to an inmate. Due to the possibility of contamination, and the possibility of the introduction of contraband, these external substances are not allowed into NCDPS's facilities. (Joyner Aff. ¶ 13)

While NCDPS maintains a strong interest in ensuring the safety and security of inmates by banning the consumption of alcohol, it balances these interests to accommodate inmates' religious practices by allowing for communion to be served in scheduled corporate (group) worship services by an approved chaplain or religious volunteer, who is supervised by a chaplain, designated staff member, or officer. To the full extent possible, NCDPS policy and practice specifically accommodates the religious exercise of several denominations of the Christian faith which ordinarily include consumption of sacramental wine as a component of a corporate religious service. For example, at Nash, Roman Catholic Mass is held monthly, for which a volunteer priest

is permitted to bring a limited amount of sacramental wine, wafers, and other ritual items into the facility, but is not permitted to share the wine with the inmates and may only consume it himself. (Hamlin Aff. ¶ 9, Ex. B; Brown Aff. ¶¶ 18-22, Ex. D and E) Also, Protestants are permitted to take Communion ("Lord's Supper") at Nash on a quarterly basis, and inmates are served wafers that come in sealed packages from preapproved vendors, and juice contained in small sealed packages which are purchased by the facility and opened at the time of service, thus protecting against possible contamination issues. (*Id.* ¶ 10, Ex. B; Brown Aff. ¶¶ 18-22, Ex. D and E)

B. *The April 2, 2018 Order imposes an impractical burden on Defendants and the equities weigh against imposing the injunction.*

Given the points discussed in Part A immediately above, the Court's order directing Defendants to ensure that Plaintiff may consume sacramental wine presents significant, impractical burdens on Defendants. (Joyner Aff. ¶ 12) Accommodating weekly pastoral visits for the Plaintiff and allowing him to consume wine during those visits, will present significant operational and security concerns at Nash. (Hamlin Aff. ¶ 5)

First, Nash employs as many as 166 correctional officers, each of whom can be assigned to work at the gatehouse where visitors are screened. At the expense of already limited time and resources, for procedural consistency, each custody employee will need to be informed and trained on special procedures for Pastor Rappe's weekly visits to ensure he is not denied access to the facility and to ensure he is permitted to bring in items that no other visitor is allowed to bring in. (*Id.* ¶ 12) As described in Section 1, the resources (additional correctional officer time and prison space) that are required in order for the prison to accommodate Pastor Rappe's pastoral visits and his provision of sacramental wine to Plaintiff are not insignificant and detract from NCDPS's ability to maintain the prison's security and safety.

Plaintiff's own personal substance abuse treatment history provides one final, tangential concern created by the Court's directive that Plaintiff be permitted to consume sacramental wine. Plaintiff was convicted of two counts of first-degree murder, both of which were drug-related. At various times during his incarceration, he has participated in programs for the treatment of substance abuse, including Drug and Alcohol Chemical Dependency Programming ("DACDP"), DACDP Aftercare, Narcotics Anonymous ("NA"), and Alcoholics Anonymous ("AA"). (Hamlin Aff. ¶ 18, Ex. C) Nash's Correctional Facility Administrator believes that Plaintiff's consumption of even a small amount of sacramental wine for religious reasons could trigger a relapse or jeopardize his compliance with what he has learned through the drug and alcohol dependency programming he has completed. (*Id.*¶ 19)

Although Plaintiff claims that he has received these accommodations in the past, an examination of Plaintiff's visitation history with Pastor Rappe shows that Plaintiff is mistaken on two counts. First, he did not receive weekly visits from Pastor Rappe; rather, he received visits, on average, once or twice a month. (Brown Aff. ¶ 10, Ex. B) Second, a temporary chaplain permitted Pastor Rappe to give sacramental wine to Plaintiff while he was confined at Pender Correctional Institution. Because the temporary chaplain is no longer employed with NCDPS, it is unknown when and with what frequency Plaintiff was permitted to receive sacramental wine while he was housed there. (*Id.* ¶ 14) However, this permission was granted in direct contravention of NCDPS policy, (*Id.* ¶ 15; Joyner Aff. ¶ 11), and no other facilities where Plaintiff has been confined have permitted Plaintiff to receive sacramental wine. (Brown Aff. ¶ 13) In Defendants' view, on those occasions when the NCDPS Religious Services policy was not followed, prison safety and security were compromised.

17

Furthermore, compliance with the ordered injunctive relief jeopardizes the order, safety, and security of Nash. Plaintiff is 34 years old, and he is serving a life sentence. Plaintiff is likely to be transferred to other facilities during the remainder of his life sentence. Every facility that Plaintiff goes to during his life sentence will have to implement special procedures to accommodate his religious needs, which can disrupt operations and impact safety and security at those facilities as well. (Hamlin Aff. ¶ 17) In light of the foregoing showing that this Court's grant of preliminary injunctive relief jeopardizes the effective functioning of Nash and potentially all NCDPS prison facilities, NCDPS's policies related to complete prohibition of inmates consumption of alcohol and the limitation of clergy visits is the least restrictive means of furthering a compelling governmental interest.

Further, even in cases where a plaintiff has shown likelihood of success on the merits and irreparable harm, the balance of equities and the public interest factors can weigh in favor of denying a preliminary injunction. *Winter,* 555 U.S. at 23-24, 31 n.5. Plaintiff has asked "the judiciary to interject itself into the day-to-day operations of a prison facility, something courts rarely should do." *Turner v. Clelland*, 2016 U.S. Dist. LEXIS 33579 (M.D.N.C. Mar. 16, 2016). Courts have also held that when a prison deems certain practices to impermissibly implicate security concerns, reversal of that policy to accommodate religious practices presents serious public policy concerns that counsel against granting a preliminary injunction. *See generally Rogers v. Stanback*, 2013 WL 6729864, at *1, *3 (M.D.N.C. 2013) (unpublished) (recommending denial of pro se prisoner's motion for TRO requesting authorization to possess certain prohibited "religious" materials, in part, because "court involvement in decisions made by prison administrators regarding materials deemed to be security threats" did not serve public interest),

18

*recommendation adopted, slip op.* (M.D.N.C. 2014). The preliminary injunctive relief ordered by this Court, including Pastor Rappe's visitation frequency, the consumption of alcohol, and the allowance of contraband within facility walls – are the very sorts of aspects of prison administration which are more appropriately left to prison officials. "Efficient and effective penal administration furthers the public's interest and involving a federal court in the day-to-day administration of a prison is a course the judiciary generally disapproves of taking." *Maxwell v. Clarke*, 2012 WL 5463200, at *2 (W.D. Va. 2012) (unpublished) (citing 18 U.S.C. § 3626(a)(2)).

In sum, reconsideration by this Court is warranted because NCDPS has shown through the attached clear and convincing evidence that: (i) NCDPS has a compelling interest in prohibiting the consumption of alcohol by inmates (safety and security), (ii) NCDPS uses the least restrictive means available to further this compelling interest (banning inmate consumption, but allowing consecrated wine to be used by clergy in periodic and supervised services), and (iii) NCDPS is unreasonably burdened by the injunction ordered April 2, 2018.

## Conclusion

For all the foregoing reasons, Defendants respectfully request that that this Court reconsider its decision and amend its April 2, 2018 Order to lift the requirement that Defendants, through NCDPS, submit to the Court a "secure method for permitting inmates to individually partake in the controlled consumption of sacramental wine during religious services in NCDPS facilities." In addition, Defendants respectfully request that this Court lift the portion of the injunction directing Defendants to: (i) permit Pastor Rappe to have weekly pastoral visits with Plaintiff and (ii) to permit Pastor Rappe to administer the Lord's Supper to Plaintiff using less than one ounce of consecrated wine.

19

Respectfully submitted this 30th day of April, 2018.

JOSHUA H. STEIN
ATTORNEY GENERAL

/s/Yvonne B. Ricci
Yvonne B. Ricci
Assistant Attorney General
N.C. State Bar No. 21641
N.C. Department of Justice
P.O. Box 629
Raleigh, North Carolina 27602-0629
Telephone:  (919) 716-6540
Facsimile:  (919) 716-6761
E-Mail:        yricci@ncdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO RECONSIDER THE COURT'S RULING GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION WITH ATTACHED AFFIDAVITS OF DEFENDANT BETTY BROWN, JOSEPH HAMLIN (NOT A PARTY), CARLTON JOYNER (NOT A PARTY), AND WARREN G. RIVENBARK, JR. (NOT A PARTY),** with the Clerk of the Court using the CM/ECF system, and served via the CM/ECF system on Plaintiff's attorneys:

> Chelsea J. Corey
> King & Spalding LLP
> 100 N. Tryon Street, Suite 3900
> Charlotte, NC 28202
>
> Kevin J. O'Brien
> King & Spalding LLP
> 1180 Peachtree Street, N.E.
> Atlanta, GA 30309

This the 30th day of April, 2018.

/s/Yvonne B. Ricci
Yvonne B. Ricci
Assistant Attorney General

21